AMANDA F. GIVENS, RESPONDENT, v. SPALDING CLOAK COMPANY, APPELLANT.—63 S. W. (2d) 819.

Kansas City Court of Appeals. September 11, 1933.

*Cowgill & Popham* and *John F. Cook* for respondent.

*Harzfeld, Beach & Steeper, William B. Dickinson* and *Martin B. Dickinson,* of counsel, for appellant.

TRIMBLE, J.—Plaintiff's action is to recover damages for alleged burns to her scalp charged to have been negligently inflicted by defendants in giving plaintiff a hair-dressing known among the ladies as a "permanent wave," or, as it is frequently called, a "permanent." She sued for $7500 and recovered a verdict and judgment for $3000 against Spalding Cloak Company, but the jury found in favor of defendant Brisboise.

The Spalding Cloak Company duly appealed; the plaintiff took the initial steps for an appeal against defendant Brisboise, but failed to perfect same; so the case now stands on the Cloak Company's appeal.

The petition alleged:

"That Spalding Cloak Company is a corporation engaged at all times herein mentioned in operating a large store in Kansas City, Missouri, and that at the times herein mentioned there was operated and maintained in said store a department and establishment known as Spalding Beauty Salon, where beauty treatments, and beauty treatment having to do with the condition and care of the human hair, were given to the public generally for fees and compensation collected by defendants therefor;.

"That defendant Pearl Griffith (now Brisboise) was at said times

the manager and in general charge of said Spalding Beauty Salon and was financially interested therein, as herein set forth;

"That defendant Spalding Cloak Company advertised said Spalding Beauty Salon in the newspapers and otherwise, advising the general public of same as a department in said store so operated by said company, and said defendant Spalding Cloak Company and defendant Pearl Griffith (now Brisboise) jointly operated said Spalding Beauty Salon in some form of partnership between them whereby the profits thereof were divided between them and they held out to the public said beauty salon as a department of said store and represented to the public, on which plaintiff relied, that said salon and said business and the operators thereof were competent to undertake heat treatment and other treatments of the human hair, and that relying thereon, plaintiff, about January, 1929, went into said store and became a customer of defendants in said Spalding Beauty Salon, and defendants and their agents thereupon, for money compensation paid defendants by plaintiff, attempted to treat and give some form of heat treatment to the scalp and hair of plaintiff, and in so doing burned the head, scalp and hair of this plaintiff and partially cooked same, causing her great physical pain and mental anguish heretofore and in the future, causing large bald places on her scalp, and permanently destroying and damaging large portions of her hair.

"That said result was extremely unusual and out of the ordinary and that said treatment and instrumentalities were exclusively under the control of defendants, and she is unable to more specifically describe the negligent conduct of defendants, but she alleges same resulted from the negligence of defendants, and that thereby she has been damaged in the sum of $7,500, for which amount she prays judgment against defendants with costs.".

The Spalding Cloak Company, admitting it was a corporation, filed a general denial as did also the defendant, Brisboise.

The record discloses the following with reference to the facts leading up to and surrounding the administration of the treatment and the infliction of the alleged burns:

The actual work of giving the hair treatment and permanent was done by Jean Kernanen, a young woman employee (of whom will appear later). The defendant, Mrs. Pearl Griffith Brisboise was the "manager" of the beauty parlor in which the permanent was given, but she did not come into the parlor until after the hair-dressing and permanent had been given, and the plaintiff customer was ready to depart.

The treatment and permanent were given in the forenoon of January 14, 1929. Plaintiff testified that she had known the operator, Miss Kernanen, for some time before that, "it might have been five or six years." Plaintiff was forty-three years old and had been a resident of Kansas City for twenty-five years. She had obtained else-

where other hair-treatments, including two permanents, from Miss Kernanen prior to this, and, knowing or having her residence telephone number, made an appointment with her, over her said residence 'phone, for the 14th of January, 1929, at the Spalding Store "to give me a permanent in the morning." Plaintiff went to the Spalding Cloak Company's store early in the morning of the 14th to get the permanent. She had never been to the store before, though, as heretofore stated, she knew Miss Kernanen, having formerly met her in two other beauty parlors and had received two permanents from her before. Upon entering the Spalding Cloak Company's store, plaintiff did not know where the beauty parlor therein was located. So she asked what she calls a "floor-walker, or a clerk or some employee therein, where the beauty parlor was?" He told her and gave her a printed card, on which was printed the following:

"VITA TONIC PERMANENT WAVES
$10.00 or, in clubs of two or more $8.50
SPALDING BEAUTY SALON
on Mezzanine Floor
Pearl Griffith, Manager

1010 Main Street Phone Main 5221
Barber in Attendance
'Our Special Service
Shampoo and Marcel
Bobbed Hair $1.00 and $1.25
We Invite You to Take Advantage of Your
Charge Account.' "

The beauty parlor was on the balcony or mezzanine floor in the store, one short flight upstairs, and an inquiry as to whether it was separated from the rest of the store did not disclose any responsive or illuminating answer, other than: "I would say it was separated because I have no elevator service."

Plaintiff found the young woman Jean Kernanen in the beauty parlor and told her she "wanted a permanent, a nice deep wave."

At this point in her testimony, she was asked:

"Q. And did they proceed to do that? A. Yes, sir.

"Q. You may just describe to the jury in your own way how they started about that and what they did. A. Well, of course, she first shampooed my hair and got it ready to wrap and she wrapped it in the usual way and put it under this machine with the pads and everything on it to give me the permanent and this was the third permanent that Jean had given me, and she always gave me a nice deep wave.

"Q. On the other occasions before when you have had the same kind of a service had it burned you or hurt you in any way? A. No; this is the first time that I had ever had that.

"Q. Now, on this occasion just explain what it was that she put

on your head, I mean any kind of apparatus or machinery of any sort. A. It looked like just any other permanent machine.

"Q. Sort of describe it to us. We do not know about those things. A. It has something that goes down and each curl is wrapped separately and then some kind of a metal goes over each curl while you are being given the permanent and baking it.

"Q. Do you know whether electricity is turned on or what? A. Yes; she turned the electricity on.

"Q. Now, while that was going on and while the power was on, did anything happen unusual? A. Well, I told Jean six times that she was burning me and each time that I would complain she would put the cotton pad under; these little pads—there are little pads put next to your head, and she would raise them up as best she could and stick cotton on each side and she would keep telling me, 'It was just my nerves.' She said she 'never saw anyone so nervous.'

"Q. (by Mr. Popham): Just explain how it hurt you, Mrs. Givens. A. Well, I never did have anything so painful as my head caused me while I was there taking that permanent. I never was before.

"Q. When you say it was burning you, what did she say? A. She said it was my 'nerves,' and she would endeavor to put cotton under those pads.

"Q. How many times did she stick cotton up under there? A. Six different times, to each place I showed her there was being burned.

"Q. After this thing was finally taken off you, how did your head feel? A. My head hurt, I had such a headache I could hardly sit still.

"Q. What did she do to your hair after that? A. Well, she washed it and she said 'it would be all right.' She said 'there was nothing wrong,' and combed it and set the waves.

"Q. Now, what was the situation after you got home and the next morning? A. Well, my head was all red in four different spots the next morning. The next morning I had water blisters in those four places and my head was so sore I could not comb my hair. I just did it up as easy as I could.

"Q. Before that time what had been the thickness and nature and kind of the hair that you had? A. I had an awful head of hair; I could not hardly buy a hat that was large enough to go over my hair, my hair was so long and thick, and then after I had my hair trimmed, you see for the permanent, it was not so long then; you see it was short.

"Q. Had you been wearing your hair short or long for some time? A. Well, I bobbed it since I have had permanents, but it was so thick then I could hardly get a hat on. I always had to have a large size.

"Q. Had you ever had any trouble with your hair at all before that? A. I never did.

"Q. Had you ever had any apparent unhealthy condition of your hair or any coming out of your hair or any sores on your head or any infection of any kind? A. No, sir.

"Q. Now, you have told us about the water blisters the next morning; what was the condition for the next several weeks or months there, in regard to the feeling of your head? A. Well, the blisters would break, and, of course, I treated them. I put olive oil and castor oil and unguentine and went by what the doctor told me. I did just by his directions so I would try to heal it up.

"Q. (by Mr. Popham): Afterwards, did you go to see a doctor about it? A. I went to see the doctor in one week afterwards.

"Q. What doctor did you go to see? A. Dr. Ralph Holbrook.

"Q. His office is up here in the Professional Building? A. Yes, sir.

"Q. Eleventh and Grand, I believe it is? A. Yes, sir.

"Q. Had you ever known Dr. Holbrook before? A. Yes, sir, twenty-two years he has been my doctor.

"Q. And what did he do for your head? A. Well, he told me to use olive oil and castor oil, to massage my head and keep those scabs softened up as best I could.

"Q. And state whether or not you carried out his directions. A. I certainly did. I did everything the doctor told me to do.

"Q. How long did the open sores and the scabs continue to actively bother you there? A. Six months.

"Q. During that six months just describe what happened when you would try to take care of your hair and comb it. A. Well, there was part of that blister and scab would come off and bunches of hair would come off in combing it and both when I would shampoo my hair.

"Q. Did you later let your hair grow out long again? A. I had to let my hair grow out to hide those places.

"Q. And how much hair finally came out of your head at these spots where you say you were burned? A. Well, the spots are still on my head just like they were.

"Q. Are they now covered with hair or are they bald? A. They are bald."

Plaintiff further testified that there were four of the bald spots, each somewhat larger than a hen's egg; that plaintiff has to keep her hair wrapped in tin curlers at night, and then keep her hair "fluffy" in an effort to hide the bald spots but does not succeed in hiding them; that she is annoyed and embarrassed by her customers (she is a dressmaker) avoiding her and asking, "What on earth—what kind of a disease have you had?" She had never had anything wrong with her hair or head before.

She further stated that it is a common practice among women to go, for hair treatments and permanents, to a girl whom they knew and whose work they like, just as men will go to a particular barber whom they know and whose work they like and who knows how the particular customer likes to have his work done; that she liked this young lady's former permanents, and had never had any difficulty of any kind or character before; that on this last occasion the young lady went about her work and the preparation of plaintiff's hair and head, in the usual way; there was nothing different in the manner of preparation or of treatment, and the machine used was the same kind as used elsewhere.

Plaintiff also admitted that the treatment, and the giving of the permanent, involved the moistening and the wrapping of strands or tresses of hair into curls around a tube or rod, and the application of heat thereto by the turning on of electricity, and that it is "up to the patron" to say whether or not there is discomfort; that the operator gives the customer a stick or a pencil with which the latter can point to the place where the heat is too hot; that when the operator is thus so notified she would always place cotton between the scalp and the curl at the place designated; that this is the usual and ordinary way of doing; and that the operator, Miss Kernanen, did this every time plaintiff indicated the heat was becoming too great and uncomfortable. Miss Kernanen was there every moment of the entire treatment. When the treatment was completed and the machine with its curlers was removed from the head, it was found that her scalp had deep red spots which were sore and very painful; plaintiff in testifying to this, was asked: "Did you make a complaint at that time to Miss Kernanen?", but the only answer plaintiff made to this question, was "My head was so sore she could hardly put my hair up, it hurt so bad that day."

Plaintiff also testified that Miss Kernanen never left the room; that defendant, Mrs. Pearl Griffith Brisboise "came in when I was just ready to leave after my permanent had been put in and all done up." Plaintiff said nothing to her about being burned, and concedes that it was not until about nine months later that she made any complaint, though she says she, before that, went back to the store to see Miss Kernanen about it but she was not there and plaintiff did not know where she had gone; she did not say anything to anyone in charge of the beauty parlor or the store in regard to the matter.

Her physician, Dr. Ralph Holbrook, testified that plaintiff came to him in January (about the 14th), 1929, and, upon examination, he found:

"A. Four scalp sores, three of them probably two by two inches, the fourth one at the back of her head a little more irregular in shape, probably two inches by one. At the time they were covered

with an ointment. They were infected. She was told what to do and the treatment continued.

"Q. How many times roughly speaking would you say she came to you, Doctor, altogether in this condition? A. I think fifteen or twenty.

"Q. Did you from your examination of the places on the head make a diagnosis as a physician as to what it was? A. Yes.

"Q. What was that diagnosis? A. They were burns.

"Q. If her head had been burned some days before and the head after being burned was red in spots as you have described on the morning afterwards and she had water blisters on her head which broke, state whether or not those would be symptoms and evidence of a burn. A. They would; yes.

"Q. Doctor, what is your opinion as to the permanency of this lady's condition, having regard to these bald spots on her head in these four areas you have described? A. Thickening of a scalp which makes that sensitive to weather changes. Of course, they will never be covered with hair.

"Q. That is a permanent condition then? A. Never be covered with hair."

It was admitted, not as against the defendant Spalding Cloak Company but as against defendant Pearl Griffith Brisboise, that she was operating the beauty parlor at the time in question. Counsel for plaintiff said at the time evidence was offered on this feature, "It won't go in as evidence against Spalding's. It is admissions against her (Mrs. Brisboise) interests." However, counsel for plaintiff also said at the time that she, Mrs. Brisboise, was "claiming that she was *solely* operating it." (Italics ours.) And then went on to introduce evidence in the attempt to show that the defendant, Spalding Cloak Company, was also operating it. (This is stated here for the reason that in the briefs it is urged that plaintiff is inconsistent in arguing, and submitting, the case on the theory that both defendants were operating the beauty parlor, when it was *admitted* that Mrs. Brisboise was operating it.)

The defendant, Mrs. Pearl Griffith Brisboise, testified that "since May, 1928, until the present time" (October 17, 1932), and consequently in 1929, she conducted a "so-called beauty parlor in the Spalding Building on Main Street;" she had no written agreement with Spalding's at all, it was a verbal agreement; "I have an arrangement of a percentage. I pay Spalding's twenty per cent of what I take in." For that twenty per cent "I get my rent, which includes my lights, my heat and water and general overhead, I might say." As to the space she occupied in the store, she said, "Well, I occupy the mezzanine floor—really I do not know the measurements. I would say it was as large as probably the width of this courtroom . . . and it would be almost as deep as from where I am sitting to the

bar''. (the railing). Asked if that space was set off from the rest of the store, she said, "It is on a balcony;" that she would say it was separated from the rest of the store because she had no elevator service; that in January, 1929, she occupied that space and still occupies it; that no one with Spalding's had the right to come in and tell the young ladies who worked for her, what to do; that she had no jurisdiction, or authority, over any other part of the store; that no one from Spalding's had the right to come in and tell her how to run the beauty shop.

Later, defendant Brisboise testified that, in addition to what she had said she got for the twenty "percentage" retained by Spalding Cloak Company from the amount taken in by the beauty parlor, she received janitor service, and the company paid for a telephone as one of its lines, over which persons calling the beauty shop would call the Spalding telephone number and would be connected, by the Spalding telephone operator, with the beauty shop. She also said, "I manage and supervise my own shop."

"Q. And when is the rent paid, as of what time? A. Well, I get my receipts the first Monday of the following week. Well, let me see how to explain that. I did business for one week and then I get my returns the following Monday.

"Q. Do you pay the people who work for you? A. No, the people who work for me?

"Q. Yes. A. Yes."

The same machine with which the permanent was given to the plaintiff, and by which she claims to have been burned, was introduced in evidence and apparently a demonstration was given with a person taking the place of one sitting as if to receive a permanent.

The customer or patron sits while the process of "baking" the hair with the machine, which has a clock attachment so that it can be set for a certain time; some hair that is fine, takes about eleven and one-half minutes to bake and some is baked only six or seven minutes. When the time for which the clock is set expires, the clock "snaps off." The machine is provided with little "bakers" into each of which is put a lock, strand or tress of hair soaked in a "permanent wave solution" and wrapped around a rod with cotton placed thereunder so as to furnish protection against the baker. The "bakers" are put over the head, ordinarily thirty to thirty-six for the average head, and are close together all over the head and then the electricity is turned on; the heat commences to be generated and the "baking" begins. The machine is known as the "Frederick, Jr." and is standard equipment throughout the beauty parlor world, and is in ordinary and general use. Mrs. Brisboise testified that she had known of three or four women who had received burns from the machine, but not "the kind of a burn" shown on the plaintiff. "It

would be impossible to get the kind of a burn that is shown on Mrs. Givens.''

On cross-examination the defendant, Mrs. Pearl Griffith Brisboise, admitted that the Spalding Cloak Company had an accounting system, and kept account of and took all the money that came into the beauty parlor and made a daily check of the money received and kept it, except at the end of the week they gave Mrs. Brisboise a check for her per cent. The beauty parlor was operated under the name of the ''Spalding Beauty Salon'' and was so referred to in the Spalding Company's advertisements.

Mrs. Pearl Griffith Brisboise further admitted that she testified, in a deposition taken before the trial, that ''a burn on the head is not caused by overbaked hair.'' ''A burn on the head is caused from what we call steam escaping.'' Her testimony continues:

''Q. (by Mr. Popham): Now, as a matter of fact, you had some pads on there that steam is supposed to permeate, didn't you? A. Yes.

''Q. What sort of pads are they? A. Well, they are that pad— I don't know how they are made. They are—they look like they are a cheese cloth pad with an aluminum foil back.

''Q. Now, how large are those pads? A. We have them there. I think they are about three inches long by about one and a half or two inches. That is, now, I am speaking of just the cloth pad.

''Q. Just the cloth pad? A. Yes.

''Q. You did not bring any of those pads down to show the jury, did you? A. Oh, yes, sir.

''Q. Where are they? A. I used one of those on the head.

''Q. Now, that is what I want to see. I know so little about it. A. That is the one (indicating) I used on her. You will find a fresh one in that box.

''Q. Now, how many of these pads were put under a baker? A. One pad.

''Q. And what was it it did, causing steam to escape into this pad? A. Well, we use a lotion on the pad that waves the hair. The pad is merely to hold the lotion. That is the only part it takes in the permanent wave, and when they get hot they create a steam from the lotion that is on the pad and that penetrates the pores of the hair; therefore, they get a permanent curl.

''Q. And if too much steam escapes they get a permanent burn? A. I would not say a permanent burn.

''Q. Madam? A. I would not say a permanent burn.

''Q. What is it that causes this steam to escape as you explained in the answer a while ago as causing people to get burned? What causes the steam to escape to burn people? A. If you notice how I put on the pads and the fibers and the steel clip and the cotton under the rod—those are all used for protection. It stands to reason that

steam can escape through the tiniest crevice. We do not say that is air-tight, but it is just as air-tight as we can get it.

"Q. But it does sometimes escape? A. It does sometimes; it can.

"Mr. Popham: I want the jury to examine the thickness of this pad, if I may (showing pad to the jury).

"Q. (by Mr. Popham): Now, the steam that is supposed to get through that pad from the baker is generated from electric heat and moisture, isn't it? A. Yes.

"Q. And that was the only pad or covering between the baker and the scalp where the hair is wrapped, isn't it? A. No; that is not the only covering.

"Q. What other covering was there? A. Well, I had cotton and the flannel covering and the fiber covering and then I had a steel clip to seal those pads with.

"Q. That is what I am getting at right now, to the question of how much cotton you had there would have much to do with the question of resistance of the steam, would it not? A. How much cotton?

"Q. Yes, ma'am. A. We put it there as a temporary precaution, I would say.

"Q. But I say the question of how much was there would have to do with the amount of resistance to the steam, would it not? A. Well, I would like to explain that question.

"Q. Well, madam, I am trying to be plain. If you had just a little bit of cotton it would not resist as much steam as a whole lot of cotton? A. No.

"Q. So, I say the question of how much cotton you have then does have a bearing on the amount of resistance there is to the steam, does it not? A. Yes.

"Q. All right. Now, we have got that. Now, the question of who puts the cotton and how much they put is determined by the operator, isn't it? A. No.

"Q. Well, who determines that; the patient? A. No, I fix my cotton and I cut it in strips. There is a strip in that box, and I make those strips myself.

"Q. Well, then, I will put it the other way around. It is determined either by the operator or you, one or the other? A. No; the operator has to wrap that strip as it is. She does not tear it down and does not add more to it, because we cannot get too much under it.

"Mr. Hook: What was that last? A. We cannot pack too much under it. If we do, we cannot get our other accessories on.

"Q. (by Mr. Popham): I do not mean to be confusing, but what I want to get at is, somebody in your establishment determines the amount of that cotton? A. In thickness?

"Q. Yes? A. No, I do.

"Q. You were in that establishment? A. Yes.

"Q. The patient does not have anything to do with determining the thickness of it, in other words, does she? A. No.

"Q. And the patient does not have anything to do with determining how long you will keep the heat on there, does she? A. No; she does not.

"Q. In other words, she is solely and exclusively in your hands when you turn that power on and put that steam on her head, isn't she? A. Yes."

She gave further evidence that the beauty parlor accounts were handled by the Spalding Cloak Company, and the company paid for at least one of the telephones over which the beauty parlor customers talked to the beauty parlor. She further said the pads get hot and create a steam "and sometimes it goes down through the foil." She said that was not because the pads were too thin at some places; but admitted that why it would burn at one place and not at another "is something in our business that I can't explain. Those are things that just happen."

Dr. Sherwin E. Mella, a skin specialist, testifying for the defendants, said he examined plaintiff at his office, at some time, perhaps a year before the trial, and when asked what conclusion he reached as to what plaintiff was suffering from, said:

"A. Well, the condition, the way the scalp presents itself and the condition of the hair, one who has had experience in the treatment of skin diseases would have to think of a condition which we call alopecia areata.

. . . . . .

"Q. (by Mr. Hook): Now, Doctor, what conclusion, or as the result of your examination just now are you confirmed or are you of a different opinion as to her condition? A. Well, her condition to-day is approximately the same as I saw it about a year ago. An alopecia areata is an inflammatory process in the scalp in which the hair comes out very suddenly in spots varying from the size of a dime to that of the size of a dollar or within the size of the palm of your hand. The condition occurs on a noninflammatory base, that is, the hair comes out very suddenly. It may all drop out at one time covering an area of, as I say, the size of a dime or even larger and there may be various spots all the way from two to many covering the scalp. This may occur on other parts of the body in which hair is involved, other parts of the body that has hair, but usually the scalp is the common place for the condition to occur, but the hair drops out and the appearance of the skin is perfectly normal; there is no evidence of redness, no evidence of swelling, no evidence of scarring. It apparently is an absolutely normal skin. It is smooth and usually very white in its color.

"Q. Now, Doctor, is it in your judgment that she is suffering at

this time from alopecia areata? A. That is the diagnosis I would have to make at this time.

"Q. And that was the diagnosis you made about a year ago? A. Yes, sir."

Dr. Mella further testified that in a second or third degree burn there would be scar tissue which is harder, more firm and uneven than ordinary tissue or flesh; that there was no scar tissue at the places claimed to have been burned; that the scalp is freely movable which would not be the case if there had been any scar tissue there; that there was no evidence of a burn.

At the risk of making this opinion unduly long, we have, nevertheless, deemed it necessary to set out the situation and the facts in evidence as fully as has been done, in order to present as clear a picture of the case as possible, so as to illuminate clearly the points involved and the theory on which the appeal is disposed of herein. Not all of the evidence is set out, but that omitted is merely such as strengthens or adds to the various points covered by that shown. From the evidence, studied in all its various bearings, we draw the following conclusions:

1. That it presents a *res ipsa loquitur* case although it would seem to be dangerously near the border line, for it is manifest that in the way the "permanent" has to be given, by means of the application of heat, electrically generated, to curls of hair wrapped by pads soaked in a "wave solution" which is likely to be converted into steam and easily cause a more or less severe burn, and it will not always follow that "the thing speaks for itself" in disclosing negligence when a burn results from the treatment. But, in this case, if the condition of plaintiff's scalp is the result of burns, it is likewise manifest that they were *far too deep and extensive* to be the usual and ordinary result of careful administration, and hence there appears to be, in the evidence, reasonable foundation for the jury, if it so believes and finds, to draw an inference of negligence in the manner of the administration of the permanent. It is not an inference which the *law itself* draws, but it is an inference of fact, which if properly supported by evidence, the law *permits the jury to find* if they deem it proper from the evidence before them. There was competent medical evidence that the condition of the scalp arose from unusually deep and severe burns, and also medical evidence that it was caused by disease. This made it a jury question, and by their verdict the jury has said it was the result of burns.

2. The petition declares against both defendants and it is therefore important to know whether the operation of the beauty parlor was that of Mrs. Pearl Griffith Brisboise alone or whether such operation was participated in by *both* of the defendants, and especially is this true since the jury has found in *favor* of the defendant Brisboise and against the Spalding Cloak Company. A study of all the evi-

dence, including that hereinabove set out as well as that omitted, convinces us that notwithstanding defendant Brisboise's apparent willingness to be considered as the owner and sole operator of the beauty parlor, renting quarters for same in the Spalding Store, there is ample evidence from which the jury could find that the defendant Spalding Cloak Company engaged in such operation as one of the departments of its store, paying Mrs. Brisboise a percentage of the beauty parlor receipts for her services, so that the Spalding Cloak Company can be regarded as liable for the negligence, if any, of Miss Kernanen, the "operator" who gave plaintiff the "permanent wave," and that too without regard to whether Mrs. Brisboise was liable, or held liable, or not.

Appellant urges that since the finding of the jury was in favor of Mrs. Brisboise, this exonerates her codefendant also, under the well-established principle that where the servant is charged with misfeasance and she and the master are joined as defendants and the petition imputes the negligence of the servant to the master, a verdict of the jury finding the servant not guilty of negligence, *ipso facto* discharges the master also, notwithstanding the jury has found against the master. This is true where the evidence presents a situation where that principle is applicable. [McGinness v. Chicago, Rock Island & Pacific Ry. Co., 200 Mo. 347; Wade v. Campbell, 211 Mo. App. 274.] But here is a case where the liability of the Spalding Cloak Company does not necessarily rest upon or grow out of the negligence of Mrs. Brisboise. Indeed, the evidence is such as to enable the jury to say that she was in no way responsible for what occurred. The operator, Miss Kernanen, administered the treatment and either she was negligent or methods by which she worked were not in some way proper. In either event the defendant Cloak Company could be held liable since, under the evidence, the jury could find that it was Miss Kernanen's master. The jury was not compelled to believe that Miss Kernanen was merely Mrs. Brisboise's employee. And the jury's failure to accept her word on that feature is not from mere wilful and arbitrary caprice, but has firm foundation in the evidence in regard to that matter. Mrs. Brisboise says she paid her employees, but prior to that she not only said she did not pay them and then hastily changed her reply in that regard, but she further testified that the employees and herself were paid in some way, she did not know how the company handled the accounts, but the payments were made by a treasurer who was not her employee. It would have been an easy matter for the Spalding Cloak Company, and also Mrs. Brisboise for that matter, to have made a full, frank and complete disclosure of the exact relations existing between them so as to show that the Cloak Company could not be held upon any theory or doctrine of *respondeat superior,* if such was the fact. But neither by pleading nor evidence did they see fit to do this, and their silence on

a matter which was exclusively within their knowledge may be regarded as a strong circumstance against them. [State ex rel. v. Trimble, 260 S. W. 1000, 1003; Sullivan v. Gideon & N. I. R. Co., 271 S. W. 983, 988.]

In addition to all this, the facts and circumstances surrounding the place and the manner in which the beauty parlor was conducted; the fact that, in Mrs. Brisboise's deposition, she testified that the employees were paid directly by check from the Spalding Cloak Company's treasurer; the inferences to be drawn from the card given plaintiff when she came into the store for the first time and asked for the beauty parlor; the fact that Miss Kernanen went on the stand, but not a question was asked her as to whom she worked for; that in many ways too numerous to relate at this time, the appealing defendant could have clearly shown what the true facts were; all unite in furnishing the jury ample justification for reaching their own conclusion as to what the real situation was. As to who in fact was the real operator of the beauty shop was clearly a question for the jury. [See Rockwell v. Standard Stamping Company, 241 S. W. 979; Spellmeyer v. Theo. Hertz & Co., 272 S. W. 1069.] It is true Mrs. Brisboise said no person connected with the Spalding Cloak Company *had the right* to control, manage, or supervise the beauty shop or those working therein; but, under the circumstances, this was in the nature of a mere legal conclusion as to the ultimate question of liability involved. These are questions to be determined by the jury from all the facts and not controlled or determined by the conclusions of any witness. [Grey v. Levy, 48 S. W. (2d) 20, 23.] In view of all that is shown in the above and foregoing, we hold that the court did not err in overruling the appealing defendant's final demurrer.

Said defendant, however, urges that in the petition plaintiff states a case charging that Mrs. Brisboise was the manager and in general charge of the beauty parlor under the name of the Spalding Beauty Salon and that the Spalding Cloak Company and Mrs. Brisboise "jointly operated said Spalding Beauty Salon" and furthermore that plaintiff, in her motion for a new trial as against defendant Brisboise, stated that the evidence conclusively shows that "said defendant Brisboise was in charge of said beauty parlor and acting on behalf of defendant Spalding Cloak Company and was operating same as a department of the general store of said company and that said company was operating said beauty parlor as a part of its general establishment and dividing its profits therefrom with said defendant Brisboise and same was being operated under her supervision and she received part of the profits therefrom, and in law should be held for the damages to plaintiff along with said company." And, under this situation, the appealing defendant urges that there is no authority for releasing Mrs. Brisboise if plaintiff had a case against either of the defendants; that under the pleadings, evidence, plaintiff's

instructions and her contention in the above-mentioned motion for new trial, defendant Brisboise, if she represented defendant Spalding Cloak Company in any manner, was no ordinary servant, employee or agent, but was a manager with sole, active and general charge over the beauty shop in question, and the work done therein, and was at the time in question actively exercising such management and supervision; therefore, both defendants were liable if either is, under the principle of Orcutt v. Century Building Company, 201 Mo. 424; Vaughn v. Mountain Grove, etc., Co., 275 S. W. 592, 595-596 (quashed in *certiorari* as to the corporate, but not as to the individual, defendant.) [See State ex rel. v. Cox et al., Judges, 315 Mo. 619; Baird v. Larrabee, etc., Corporation, 203 Mo. App. 432.]

We fail to see wherein the rule sought to be applied herein is applicable to the case as disclosed by the evidence. Plaintiff ought not to be confined to the precise case defendant insists she pleaded in attempting to set out the unknown relationship existing between the two defendants with reference to the store and the beauty shop. That was a relationship strictly within the knowledge of the defendants, but they chose to be as secret about it as they possibly could, and furnished no pleading nor evidence in that regard except that which was "cork-screwed" out of them by cross-examination. Hence they cannot now complain if the evidence adduced discloses a situation from which the jury could draw a conclusion at variance with defendants' undisclosed notion thereof. Miss Kernanen was the servant who gave the treatment in which the injury occurred, and she was by the jury's verdict convicted of negligence; but the finding that Mrs. Brisboise was not responsible for the burns did not necessarily controvert or destroy the other finding, namely, that her codefendant was. Under the circumstances of this case, as we view it, the authorities relied on by the appealing defendant on this point are not applicable.

From what has been said it would seem that, not only was there no error in refusing to sustain the appealing defendant's demurrer, but there was none in giving plaintiff's instruction No. 1, which is as follows:

"The court instructs the jury if you believe from the evidence that the beauty parlor referred to in evidence at the times in question was located in and was being operated in the store of defendant Spalding Cloak Company and was being operated as a department and as part of said general store, if you so find, and was being operated under the name of Spalding Beauty Salon with the knowledge of said defendant Spalding Cloak Company, if you so find, and that said defendant Spalding Cloak Company thereby and by advertising, if you so find it did, held out to the general public that said beauty parlor was one of the departments of said store and was under the operation and control of said defendant Spalding Cloak Company, if you so find, and that at said times an arrangement existed between defend-

ant Pearl Griffith Brisboise and said defendant Spalding Cloak Company under the terms of which all the money taken in by said beauty parlor passed into the hands of said defendant Spalding Cloak Company, if you so find, and that said defendant Spalding Cloak Company returned and paid a percentage thereof to Pearl Griffith Brisboise and the profits of said beauty parlor were divided between said defendant Spalding Cloak Company and said defendant Pearl Griffith Brisboise with a fixed and certain percentage to each, if you so find, and that said defendant Pearl Griffith Brisboise operated said beauty shop for and in behalf of herself and said defendant Spalding Cloak Company as part of defendant Spalding Cloak Company's business in running a general department store, if you so find, and that in receiving said hair service and treatment, if you so find she did, plaintiff's head was burned and she was thereby injured, if you so find, then the court instructs you that both defendants would be responsible in law for any negligence, if any, directly resulting in plaintiff being so burned and injured, if you so find she was so burned and injured, while receiving said service in said beauty shop at said time.''

In objecting to this instruction, defendant concedes that the facts submitted are stated in the conjunctive, and while its many objections thereto are stated with no citation of authority to uphold them, it is clear that most of them arise from the erroneous view heretofore disclosed as being entertained by said defendant and by us disposed of adversely to it. The fact that the instruction uses the word ''profits'' does not render it reversibly erroneous, for it is apparent, from the explanation afforded in the instruction itself, that this was merely a short way of designating the proceeds taken in by the beauty parlor. If any of the facts submitted in the instruction were not necessary or were immaterial (we do not impliedly concede that there are such), as they were all in the conjunctive, their submission could not be harmful. The instruction deals with the liability of *both* defendants, submits every fact essential, with nothing prejudicial in it, and everything submitted were circumstances and matters legally inferable from, and within the scope of, the evidence. We find no reversible error in it.

Error is charged by appellant in the giving of plaintiff's instruction No. 2. It reads as follows:

''The court instructs the jury if you find the facts to be as submitted in instruction No. 1 and find that both defendants were operating the beauty parlor known as the Spalding Beauty Salon in the store of defendant Spalding Cloak Company at the times in question and that plaintiff about January 14, 1929, while receiving a permanent wave or the hair treatment and hair service referred to in evidence in said beauty shop, if you so find she did, was burned upon her head and was thereby injured, if from the evidence you so find,

and that such burning of her head and her said injuries, if you so find she was so burned and injured, was an extremely unusual and extraordinary occurrence and result to customers and members of the public usually receiving such treatment and hair service if you so find and that in similar service from beauty parlors generally and from persons engaged in said business such burns and injuries did not and do not usually occur, if you so find, and if the jury further believe from the evidence that the giving of said treatment or hair service and all the apparatus and machinery and utensils connected therewith and used therein were exclusively and solely under the control of defendants, if you so find, then the court instructs the jury that an inference arises that said burns and injuries, if you so find she was so burned and injured, resulted from negligence of defendants.

"The term 'negligence' as used in these instructions means failure to use 'ordinary care.' The term quoted 'ordinary care' means such care as would usually be exercised by ordinarily careful and prudent persons engaged in like business under similar circumstances."

This instruction, in our view, is reversibly erroneous. After submitting to the jury in the conjunctive various questions of fact, commencing with the operation of the beauty parlor in the Spalding Store and including the question of plaintiff's receiving the hair treatment and "permanent wave" and the burns complained of, the question of whether the receiving of the burns, if any, was an "extremely unusual and extraordinary occurrence and result" to customers usually receiving such treatment, and that such burns do not usually occur, and that the giving of such treatment and all the appliances were solely under the control of the defendant, *"then the court instructs the jury that an inference arises that said burns and injuries, if you so find she was so burned and injured, resulted from negligence of defendants,"* etc.

In other words, the court tells the jury that if they find the facts submitted, then an inference of negligence necessarily arises, as a *matter of law,* not as an inference of *fact* which the jury may draw from a proper view of the evidence before them. This, it seems to us, is *taking away from the jury* the question of whether they will draw an inference of negligence from the evidence before them. As hereinbefore stated, it is not an inference which the *law* draws, but it is an inference of fact, which if properly supported by the evidence, the law permits to the *jury* to draw if deemed proper from the evidence. As said by RAGLAND, J., in his concurring opinion in McCloskey v. Koplar, 46 S. W. (2d) 557, l. c. 564, "it was solely the prerogative of the jury to determine *what inference, if any,* they would draw from plaintiff's proof, *without intrusion on the part of the court.* [Hain v. Barrett, 28 Mo. 388; Martin v. Heidron, 135 Mo. 608, 37 S. W. 504; State ex rel. v. Ellison, 268 Mo. 239, 187 S. W. 175; Sowders v. Rail-

roads, 127 Mo. App. 119, 104 S. W. 1122; Bevan v. Hill (Mo. App.), 262 S. W. 416.''] (Italics ours.) The learned judge also refers to the language of the United States Supreme Court in Sweeney v. Erving, 228 U. S. 233, 240, 33 Sup. Ct. Rep. 416, 418, where it is said:

''In our opinion, *res ipsa loquitur* means that the facts of the occurrence *warrant* the inference of negligence not that they *compel* such an inference; that they furnish circumstantial evidence of negligence where direct evidence of it may be lacking, but it is evidence to be weighed, *not necessarily to be accepted as sufficient;* that they call for explanation or rebuttal, not necessarily that they require it; that they *make a case to be decided by the jury* not that they forestall the verdict.'' (All italics ours.)

We cannot dismiss the effect of the above cited cases with the idea that such remarks deal solely with the question of where the burden of proof properly lies.

Other errors are complained of in the instructions but as the one noticed calls for a reversal and remanding, it is unnecessary to notice them, since if they are errors, they can be avoided on the next trial.

The judgment is reversed and the cause remanded. All concur.