JAMES W. BAIRD, Respondent, v. LARABEE FLOUR MILLS CORPORATION, and ELMER W. WHITE MAN, Appellants.

Kansas City Court of Appeals, April 5, 1920.

1. **MASTER AND SERVANT:** Negigence of Vice-Principal: Misfeasance and Non-feasance: Separable Controversy. The petition alleged that the defendant corporation acting through W. as its agent, superintendent and vice-principal, and the defendant W. negligently stopped the operation of a "man-lift," and that through the negligence of the defendant corporation, acting through the defendant W. and through the negligence of defendant W. said "man-lift" was permitted to be suddenly started. *Held*, that the word "permitted" as used in the petition charged an act of misfeasance for which both the corporation and W. were responsible,

and hence no separable controversy existed so as to permit removal to a federal court by the non-resident corporation.

2. ———: ———: **Conflicting Evidence.** The defendant's demurrer to the evidence is properly overruled when there is conflicting evidence bearing upon the question of whether or not its vice-principal might have reasonably anticipated the attemped use of the apparatus on which plaintiff was injured, at the time of the injury.

3. ———: **Inadequate Rules: Argument of Counsel.** Where there are no allegations of inadequate rules or of lack of safety devices, their absence is not an issue, but counsel in argument may refer to defendant's knowledge that no such rules or devices existed as bearing on the question of whether or not the defendant exercised due care in what he did under the circumstances, but counsel cannot argue that defendant is liable for failure to have rules under the circumstances, and the trial court is in a better position to determine whether or not counsel is keeping within the issues, or making an attempt to appeal to the passions or prejudices of the jury.

4. **APPEAL AND ERROR: Argument of Counsel: Bill of Exceptions.** Argument of counsel, complained of as being erroneous, must be preserved in the bill of exceptions for review, and it is insufficient that said argument is contained in the motion for a new trial.

Appeal from Buchanan Circuit Court.—*Hon. Lawrence A. Vories,* Judge.

AFFIRMED.

*Duvall & Boyd, Barney E. Reilly* and *W. B. Norris* for respondent.

*T. A. Noftzer* and *William E. Stringfellow* for appellant, Larabee Flour Mills Corporation.

*Joseph M. Garvey* for appellant, Elmer W. Whiteman.

BLAND, J.—This is an action for damages for personal injuries sustained by plaintiff, an employee of the defendant, Larabee Flour Mills Corporation, on account of the negligence of the defendant, Whiteman,

vice-principal and foreman of the corporation. There was a verdict and judgment in favor of plaintiff in the sum of $5000 and against both defendants.

The facts show that defendant, Larabee Flour Mills Corporation, hereinafter called the corporation, was incorporated under the laws of the State of Kansas and engaged in the operation of a flour mill in the State of Missouri near St. Joseph. Plaintiff was injured in the following manner:

There existed in the mill an elevator or manlift which was used by employees therein for the purpose of going from one floor to another in the mill. The elevator or manlift ran through circular openings in the floors. These openings were about thirty inches wide at the widest point. The distance from the floors to the ceiling was about ten feet. The manlift was operated by an electric motor and consisted of a continuous belt that ran around pulleys from the basement to the eighth story of the building. On this belt was attached steps about eighteen inches long. About four feet above each step there was a handle to be used by the passenger to hold himself on the step. There were sixteen of such steps attached to the belt upon which the men stood as they were carried from one floor to another. The manlift operated continuously and it was not intended that it be started or stopped on each occasion of use, but it was run slow enough so that persons at the various floors might step off or on to the steps of the same while it was in motion. The manlift could be started or stopped by means of a cord attached along side of it. This cord was about the size of an ordinary window rope. The cord passed through eyelets about four feet apart which were attached to the frame of the manlift. The manlift was started or stopped by pulling the cord which, by a certain mechanism, caused the belt to shift from a live to a dead pulley and the current by the use of the cord was shut off or put on by a switch. The manlift could be started or stopped by pulling on the cord from

any floor of the building or by any person riding on the lift. If the one holding the cord did not hold it firmly, anyone could put the manlift in motion by pulling the cord, or the manlift could be started if any person who stopped it let loose of the cord. It required very little force to manipulate the cord.

On the morning of October 24, 1918, the defendant, Whiteman, who was plaintiff's foreman, noticed that the manlift was moving too slowly and was overloaded. Previous experience told him that such a condition sometimes caused the motor to burn out. Whiteman, standing on the 4th floor, began to tell the men, one by one, as they reached the 4th floor, to get off thereat. The first man told got off but plaintiff when he reached the fourth floor did not get off but continued on and when he reached the fifth floor Whiteman pulled the rope or cord which controlled the manlift to stop the same and at the same time called to plaintiff to get off. The manlift stopped at the 5th floor and while plaintiff was in the act of getting off another ordinary employee of the corporation pulled the rope from the seventh floor, causing the manlift to start, throwing plaintiff so that he fell through the opening of the manlift to the fourth floor to his serious injury.

The foregoing is a general statement as to the manner in which plaintiff was injured, other facts necessary to be understood in determining the points raised will be disclosed in the course of the opinion.

The petition alleged the incorporation of the corporation defendant; that Whiteman was an employee of the corporation as its foreman, superintendent and vice-principal; that Whiteman was a resident of the State of Missouri; that defendant corporation operated a flour mill with a manlift running by electric power; it described the method of its starting and stopping; that plaintiff was riding on the manlift in the prosecution of his work. It then alleges:

"   . . . that at said time the defendant company, acting through the defendant Elmer W. White-

man, as its agent, superintendant and vice-principal, and the defendant Elmer W. Whiteman carelessly and negligently stopped said 'manlift' when and at a time when the step upon which plaintiff was riding was some three or four feet above one of the floors of said building and *negligently* ordered, directed and commanded plaintiff to get off of and alight from said 'manlift;' that while obeying the direction, order and command of defendant company, and defendant Elmer W. Whiteman, and while in the exercise of ordinary care on his part and while in the act of stepping from and leaving said 'manlift,' said 'manlift' was by reason of the carelessness, negligence and recklessness of defendant company acting through the defendant Elmer W. Whiteman, and the defendant Elmer W. Whiteman, suddenly started *and permitted to be suddenly started* in motion and that as a result of said negligence plaintiff was thrown from said 'manlift,' etc.''

This was an amended petition. The original petition contained the same words except those set forth above in italics which were inserted by interlineation.

Defendants' first point is that the trial court was without jurisdiction of the cause for the reason that the ameded petition stated a separable controversy and that in due time, after the amendment of the petition, it filed a petition and bond for removal to the federal court. In support of this contention defendants urge that ''to start an elevator in motion is a very distinct thing from permitting it to be started.'' That the petition is to be construed as charging that the defendant corporation permitted the elevator to be started and that such a charge authorized the introduction of evidence of insufficient rules and safety devices, and that defendant Whiteman could not be held responsible for that negligence, if any, and, therefore, there was an independent charge against the defendant corporation. And it is claimed that if the charge that the manlift was permitted to be started is held to be a charge against the defendant Whiteman, it charges an act which

on his part could only be an act of non-feasance for which the corporation would be liable and not Whiteman.

We think that the allegations of the petition amount to a charge of misfeasance and negligent performance of duty on the part of Whiteman for which both Whiteman and the corporation would be liable. The petition discloses no liability against the corporation that did not exist against Whiteman and consequently if Whiteman had been acquitted of negligence, the corporation defendant would have escaped also as a matter of law, and, therefore, there was no separable controversy. [McGinnis v. Chicago, R. I. & P. Ry. Co., 200 Mo. 347; Whiteaker v. Railroad, 252 Mo. 438. 439, 50.] We say this because the petition alleges that the manlift was "suddenly started and permitted to be suddenly started" through the negligence of both defendants. Of course, if the petition meant to allege non feasance on the part of the defendant Whiteman, it would not have alleged that he, for himself as well as for the corporation, negligently started the manlift, consequently the allegations of the petition must be taken as merely a charge that Whiteman either started the manlift ·or omitted to do certain acts which he should have done in handling the manlift under the circumstances. In other words, the word "permitted" as used in the petition amounts to a charge of an affirmative act on the part of Whiteman in allowing the manlift to be started. That the word "permitted" is often to be taken in such a sense is well established. [Winslow v. M. K. & T. Ry. Co., 192 S. W. 121, 124; Warberton & Kng v. Woods, 6 Mo. 8; Coon v. Froment, 49 N. Y. Supp. 305; see also Louisville & Nashville Rd. Co. v. Smith, 50 Southern (Ala.) 241.] It is, therefore, apparent that the allegations that defendnts "suddenly started" and "permitted to be suddenly started" were synonymous phrases. It is well settled that where the agent enters into the performance of the duty of the master and he neglects those duties in any respect he has been guilty

of misfeasance and is liable to the party injured. [Orcutt v. Century Building Co., 201 Mo. 424, 449. 450.]

It is next insisted that defendants' demurrer to the evidence instruction should have been given. Plaintiff's theory was that the foreman was negligent in permitting the manlift to be started while plaintiff was in the act of alighting therefrom; that Whiteman could have reasonably anticipated that if he did not firmly grasp the rope after he had stopped the manlift, that some other person in the mill might start the same while plaintiff was attempting to alight. Defendants contend that Whiteman had no reason to anticipate that any other person would pull the rope or attemp to start the manlift. In support of this contention defendants say that the evidence is un disputed that there was a rule or understanding (there was no printed rule) covering the operation of the man-lift to the effect that if for any reason the manlift should be stopped "only a limited number of men had the right to start the same, namely, (1) the superintendent, (2) the headmiller, or in his absence whichever one of the three assistant millers—one to each shift—who might be in charge, (3) the millright foreman, (4) the electrician, or foreman of construction (both of these positions being held by one man) . . . and that such men were forbidden to start it until they had made careful investigation of the cause of its being stopped." Under these circumstances there would be a total of four men in the mill at any one time who were authorized to start the manlift. Mr. Bowers, the superintendent, was absent at the time of the accident and the foreman, Whiteman, having stopped the manlift, it is contended that this leaves only two other men in the mill who had authority to start it under the conditions. That under such circumstances Whiteman could not have reasonably anticipated that the manlift would have been started. There was evidence tending to support defendants' contention but there was other evidence that there were four men at the mill at the time

who had the right under the rules to start the lift and yet other evidence that there were a dozen millers or millwright men who had the right to start it.

There were two set~ of employees in the mill; one was engaged in the operation of the mill proper and one on construction work about the mill. Plaintiff was a member of the latter set. There were 28 men that were engaged in operating the mill proper who used the manlift. There is testimony that they had been instructed not to stop or start the manlift but there is no testimony that the members of the construction gang were so instructed. There was however, testimony that the foreman of the construction gang had been given such instructions but there is no evidence that he notified the men under him. While there was much evidence that those persons who were authorized to start the manlift were required before doing so to find out the cause of the stopping of the same, we are not prepared to say under the circumstances that the jury were required to take this evidence as true. In the first place, it is apparent that taking the evidence in its most favorable light to plaintiff, there were more men who the foreman could have anticipated might start the manlift than those the defendants claim were the only men authorized to start the same. In the second place, the witness who gave testimony tending to support defendants' contention stated that if an employee was on the manlift and it stopped for some reason while he was between floors, that he could not start the same himself but would have to wait for some person who defendants claim was authorized to start it to come and investigate the cause of the stopping. It was also brought out on cross-examination of this witness that party authorized to start the manlift might have to walk up the stairway even to the top of the mill, which, as we have already stated, was eight stories, and probably investigate on each floor as to the source of the trouble. In this connection the testimony of the general superintendent of the corporation is significant. In describing how the rope which controlled the starting

and stopping of the manlift operated, this witness stated that the rope—

". . . passes down along the manlift to the basement, passes through sheaves up to the opposite side. It is one continuous rope down and around and up. The idea is that in going up on the north side that is so connected that if a person has occasion—if for any reason he wanted to stop the elevator while he is on the elevator he can take hold of the rope and a movement of possibly four inches, pulling the rope four inches, will throw the bell crank and disconnect the switch on the motor, and on the descending side the same thing, the rope being pulled in the direction in which you are going, will stop it; starting, it must be pulled in the opposite direction."

Is this not a concession that the rope was placed in such a position that *any* person, being on the elevator and desiring to stop the same or to start it, could do so without calling to his assistance someone who was not on the elevator? And that no investigation before action was necessary? Was not the rope so placed that one on the manlift could stop or start the same in an emergency without calling upon any one for assistance? This would perhaps sound more reasonable to a jury than to say that a man held on the elevator when it stopped between floors would have to get one of three or four men to investigate the elevator for possibly the entire eight stories before putting the same in operation again. At any rate, there were a number of men in the elevator among the construction gang who the evidence does not show knew of any rule or custom relative to the stopping or starting of the manlift. Aside from this, there was other testimony in the form of admissions on the part of defendant Whiteman that he could have anticipated that someone might have started the manlift while plaintiff was attempting to alight therefrom. While he repeatedly stated that he had no reason to believe that anyone would attempt to start the elevator under the circumstances, he was finally prevailed upon to testify on cross-examination as follows:

"Q. The first time you thought the elevator might be started was when the rope jerked out of your hands? A. I knew it would if somebody was there that didn't understand it he might jerk the rope.

Q. You knew that when you stopped it? A. I knew it all the time; knew it before.

Q. You didn't think about it? A. If I had not thought about it I would have let loose of the rope as soon as I had stopped it.

Q. Then you did think somebody might start it? A. Thought they would if somebody was on that didn't understand it.

Q. You thought somebody might start it, therefore you held to the rope so they couldn't start it? A. Yes."

Here is an admission on the part of Whiteman that he anticipated that someone might start the manlift and for this reason he held to the rope (he had already testified that he held *tightly* to it) to prevent the same from being started. There is no question but that from all the evidence the jury was authorized to say that Whiteman could reasonably have anticipated the starting to the manlift under the circumstances.

Defendants contend that the evidence shows that the manlift *was never started* except by the persons that defendants claim had authority to start it until after an investigation on the part of such persons as to the cause of the stopping of it. Witnesses testifying to these facts did not state that the manlift had not been started except under such circumsances but stated that as far as they knew it had not been. While there is some evidence that the manlift had only been stopped and started two or hree times before his occurrence, there is other evidence that this had occurred "several times." As we have already said, the manlift was designed to be more or less in continuous operation. That there was evidence that it had been started and stopped before a sufficient number of times to have put a reasonably prudent person on notice that it might be started at the time in question, was a matter suffi-

cient to call for the judgment of the jury, especially in view of Whiteman's admission that he anticipated someone might start it and for that reason *he held tightly to the rope.*

Defendants contend that even though Whiteman could have anticipated that someone might start the manlift by pulling on the cord, that he held tightly to the cord and that it was merely a question of his strength against that of the employee on the 7th floor who pulled the cord and started the manlift. There was some evidence that Whiteman held tightly to the cord but there was other evidence that while he closed his hands to draw the cord out so as to stop the manlift that after he got it out he merely held on to it with his fingers and held his hand loosened. There was testimony that there was as much as a minute or more intervening from the time he stopped the manlift until the cord was pulled out of his hand. During this period he was watching plaintiff above while plaintiff was in the act of alighting from the manlift in accordance with Whiteman's orders. The testimony all shows that there was only one means of starting or stopping the manlift and that was by pulling upon the cord. If one would hold to the rope tight enough the manlift could not be started. There was no safety device whatever unless this be called one. Whiteman knew that the only assurance he had that plaintiff would not be injured while attempting to alight from the manlift was that he, Whiteman, should grasp the rope so that no one could pull it out of his hands. While the employee who pulled the rope said he gave it a good pull there was evidence to go to the jury as to whether it was not Whiteman's failure to grasp the rope that caused the manlift to start. Whiteman described the pull as a jerk and we gather from this testimony that it was more or less severe. There was no occasion for the cord to be pulled or jerked with any great force for the reason that the mechanism worked very easily. There was evidence, as we have already stated, that Whiteman did not tightly

grasp the rope but held it loosely. Whether he was negligent in so doing and whether he would have held to the cord had he grasped it tightly was a question for the jury. We certainly cannot say in the light of the testimony favorable to plaintiff on this point that there was a contest of strength between Whiteman and the man who pulled the rope.

There is nothing in the contention that Whiteman's negligence is founded upon his "failure to think fast enough." He tesified that he held the rope tightly for the reason that he anticipated that someone might try to start the elevator. At any rate, he had ample time to both think and act. There is evidence that the manlift had stopped as much as a minute or more before the rope was pulled. Whiteman not only had time to think and act after he stopped the manlift but he had time to know the situation before he stopped it. In fact, his testimony shows that he knew of the danger. For, as we have already stated, he testified that he anticipated that someone might start the manlift. The demurrer to the evidence instructions, offered on the part of both defendants, was properly refused.

It is urged that the court erred in permitting plaintiff's counsel, over defendants' objections to argue to the jury that defendant corporation had improper or inadequate rules governing the operation of the manlift and failed to have a proper safety device. Of course, this was not an issue in the case. In arguing to the jury plaintiff's counsel stressed the point with great emphasis that Whiteman was negligent and called the jury's attention to the fact that the only safety device the corporation had "to keep from killing a man" depended upon the strength of the man pulling the rope to start the elevator; that "if he was stronger than the man upstairs trying to hold the elevator . . . the employee may be killed, and if the fellow upstairs has enough strength to hold it, the employee is safe." "Isn't that a beautiful safety device?" "He (Whiteman) knew those things."

The trend of the argument reported in the bill of exceptions was that Whiteman knew that the only way that he could protect plaintiff in alighting from the manlift was to hold tightly to the cord; that no other device was furnished to protect plaintiff and in view of such circumstances the duty was particularly strong upon Whiteman to act on the theory that someone might pull the rope and cause the manlift to start. When defendants' counsel objected to the remarks of plaintiff's counsel sometimes prior to this statement, plaintiff's counsel stated "my remarks were not directed to any lia bility of the defendants because they did not have proper rules but whether the man knowing that they did not have proper rules, did not use ordinary care." The court stated near the beginning of that part of the argument contained in the bill of exceptions that he did not understand plaintiff's counsel was arguing that defendant corporation was liable because of insufficient or improper rules. The trial court having heard the argument is in a much better position to know whether an improper influence was exerted over the jury than an appellate court can possibly be, especially in view of the fact that only a portion of the argument has been presented to us. [Wendler v. People's Furnishing Co., 165 Mo. 527.] It is the duty of the trial court to keep counsel within the issues when the latter is addressing the jury and to see that no appeal to the passions or prejudices of the jury is made. We fail to find where the trial court violated its duty in any of these respects in this case.

There is an attack made upon some other portion of the argument but the argument so complained of is sot contained in the bill of exceptions. This prevents us from considering the same. It is true that the remarks of plaintiff's counsel is contained in the motion for a new trial but this is not sufficient to preserve the matter. [State v. Lloyd, 217 S. W. 26; Jones & Jones v. Cooley Lake Club, 122 Mo. App. 113.]

The judgment is affirmed. All concur.