John E. CARNES, Respondent,

v.

KANSAS CITY SOUTHERN RAILWAY CO., Appellant.

No. 47097.

Supreme Court of Missouri,

Division No. 1.

Nov. 9, 1959.

Johnson, Johnson & Landis, Thomas A. Johnson, James P. Landis, Neosho, for appellant.

Edward V. Sweeney, Monett, J. John Marshall, Pittsburg, Kan., for respondent.

HOLMAN, Commissioner.

In this action to recover damages for personal injuries under the Federal Employers' Liability Act, 45 U.S.C.A. § 51 et seq., plaintiff obtained a verdict for $52,-000. Defendant has duly appealed from the ensuing judgment and here contends that the trial court erred (1) in instructing the jury, (2) in the exclusion of certain evidence relating to defendant's safety rules, (3) in allowing argument by counsel for plaintiff concerning an item of damage not supported by the evidence, and (4) in failing to grant a new trial because of the excessiveness of the verdict.

As indicated, there is no contention that plaintiff failed to make a submissible case for the jury. We will therefore state only such facts as appear necessary for an understanding of the points briefed.

Plaintiff had been an employee of defendant much of the time since July 11, 1920, and since 1942 had worked as an engineer operating trains out of Pittsburg, Kansas. In this action he contends that his injuries resulted from two separate falls which he sustained at different places on defendant's property. The first fall occurred on August 8, 1956, in defendant's yards at Kansas City, Missouri. The defendant maintained a cinder path about two blocks in length for use by its employees in going from the roundhouse to a cafe and small hotel which was provided for the convenience of the employees. At 8:45 p. m. on the date mentioned plaintiff was walking along the path on his way to work when he stepped in a hole and fell, sustaining injuries to his right hip and knee. Plaintiff testified that he was aware of the hole because his fireman had fallen into it on August 3 and had told him about it; that the hole was "18 to 24 inches deep and wide" and three or four feet long; that there were no lights on the path that night and, although he tried to keep to the right-hand side of the path to avoid stepping in the hole, "the first thing I knew I was in the hole." Plaintiff further stated that he was able to go on to work but soreness set in in three or four hours and in ten or twelve hours "I was really sore." However, plaintiff did not lose any time from his work and did not have any medical attention until sometime after his second fall.

At about 4 a. m. on October 8, 1956, plaintiff had returned from a run and had stopped his five-unit diesel engine just north of the roundhouse in Pittsburg, Kansas, alongside a concrete platform upon which the laborers worked in putting diesel fuel and sand in the engines. Plaintiff stated that this platform was slippery at all times; that there were a number of low places in the concrete where a mixture of oil and water would collect; that this greasy condition had existed for several years and that he had previously slipped on this platform; that on the morning in question he alighted from the engine and was walking along the west side of the track checking the unit; that when he reached the concrete platform he first walked on a wooden rack on the platform; that when he stepped off of the rack he slipped and fell; that he had stepped in oil which had been covered over with something that looked like sand; that it was "diesel oil mixed with dirt"; that he could tell from the appearance of the "oily slick spot" where he fell that "it had been there several hours"; that this fall was harder than the one he had sustained in Kansas City; that both knees had hit the pavement with the right knee "hitting the hardest"; that he felt considerable pain but after a few minutes got up and went in the roundhouse where he reported the fact of his fall to his fireman and to a clerk.

Plaintiff had considerable soreness, pain and some swelling in his right knee and ankle but continued to work until October 23. At that time plaintiff realized that he was getting worse and consulted a doctor who said it was just muscular pain and recommended that he stay off his leg and apply heat. Plaintiff followed this course of treatment and his leg got some better so that he returned to work on November 21. On one occasion (December 2) plaintiff experienced a "terrific" pain in his right heel when he put his foot down on the floor. For a time, on December 7, his right leg felt like it "would drop off at the hip." On the morning of the 8th plaintiff returned to his home in Pittsburg and went to bed. That night he called a doctor who examined him and expressed the opinion that plaintiff was going to lose his foot. On the next day, the doctor sent him to the University of Kansas Medical Center in Kansas City, Kansas, where he was treated all night in an effort to save his leg, but on the early morning of December 10 plaintiff underwent an operation and his right leg was amputated above the knee. Other facts relating to plaintiff's illness, treatment and recovery will be hereinafter stated in connection with our discussion of the contention of excessiveness.

Ernest Markquardt, a laborer who worked on the fuel ramp about the time plaintiff was injured, testified that sometimes air in the tank would cause the spilling of from five to ten or even as much as twenty gallons of diesel oil in filling a tank; that there were low places in the platform where water and oil would stand, and although they would wash the platform with a mixture of water and steam, it was almost impossible to get all of the oil off; that the platform was always slick—always hazardous, and he had seen quite a few men slip on the platform.

The evidence of both plaintiff and defendant was to the effect that there was no way for any oil or grease to get on the platform except from the spilling of diesel fuel in the operation of refueling; that the laborers engaged in refueling would know when this oil was spilled and that it was their duty to clean the platform. It was also the undisputed evidence that the last engine serviced at this platform before plaintiff fell arrived at 1:25 a. m. and that said engine should have been refueled and resanded with time remaining for cleaning the platform, if such was necessary, before 4 a. m.

█ The first point briefed relates to plaintiff's main verdict-directing instruction (No. 1). It need not be set out in

619

full. Therein, the jury was required to find that there was a hole in the cinder path and by reason thereof the path was not reasonably safe and that defendant "knew of the existence of said hole or depression or in the exercise of ordinary care could have known of its existence in time to have repaired and corrected it prior to the night of August 8, 1956, and if you find that they negligently failed to do so" and that plaintiff fell in the hole and was injured, and that thereafter, on October 8, 1956, "defendant, its agents and employees, caused or permitted a wet, oily and slippery condition to exist on said platform at and prior to the time that plaintiff walked thereon on the date aforesaid, and if you find that defendant thereby failed to exercise ordinary care to furnish plaintiff a reasonably safe place to work and was negligent, and if you find that as a direct result of such negligence of defendant, in whole or in part, plaintiff, while walking on said platform, slipped and fell, and if you find that as a direct result of either or both of the above-mentioned falls, plaintiff was injured, then the court instructs you that your verdict should be in favor of the plaintiff, John E. Carnes, and against the defendant."

Defendant says the instruction is erroneous because, in submitting the facts relating to the second fall, the jury was not required to find that defendant had actual or constructive knowledge of the slippery condition of the platform in time to have taken steps to eliminate the dangerous condition before plaintiff fell thereon. There can be no question but that such knowledge is a prerequisite of defendant's liability. Hatfield v. Thompson, Mo.Sup., 252 S.W.2d 534.

In Howard v. Missouri Pacific Railroad Co., Mo.Sup., 295 S.W.2d 68, plaintiff's main instruction had the same deficiency as the instant one. We there held that the omission did not constitute prejudicial error because the instruction did require a finding that the metal bolt which caused the injury was *caused and permitted* by defendant to be and remain at said place, etc. In holding that the failure to submit knowledge or notice was not prejudicial, we said (295 S.W.2d 75): "This is not because the fact of knowledge or notice is not essential in such a case. But it is because, since defendant caused and permitted the condition to obtain, defendant must have had knowledge of it and of the natural and probable consequences thereof."

The instant instruction required a finding that defendant *"caused or permitted"* the oily and slippery condition to exist. Defendant contends that this instruction must be distinguished from the one in the Howard case because it uses the phrase "caused *or* permitted" instead of the words "caused *and* permitted."

It is obvious that the phrase using the conjunction "and" does not have the same meaning as the one using the disjunctive "or." The first would require a finding that the condition was caused and also permitted to exist. The other phrase would only require a finding that the condition was either caused or was permitted to exist but not necessarily both. However, in the case under review, it would make no difference because either the word "caused" or the word "permitted" necessarily implies knowledge.

It goes without saying that one who causes a condition such as the one complained of herein would have knowledge of it. It is also true that one who permitted such a condition to exist would have knowledge of the condition. " 'Permit' means to allow by tacit consent; to grant leave to by express consent or authorization; to authorize. 'Permit' is not synonymous with 'allow' and 'suffer.' It is a much more positive term denoting 'a decided assent.' City of Chicago v. Stearns, 105 Ill. 554, 558. It is perhaps sometimes used synonymously with 'suffer' under certain circumstances, but ordinarily it implies knowledge and consent and means to grant leave; to tolerate * * *." Winslow v. Missouri, K. & T. R. Co., Mo.App., 192 S.W. 121, 124.

Somewhat similar definitions appear in Hicks v. Missouri Pacific R. Co., 225 Mo. App. 1053, 40 S.W.2d 512, Sanders v. City of Carthage, 330 Mo. 844, 51 S.W.2d 529, and Baird v. Larabee Flour Mills Corp., 203 Mo.App. 432, 220 S.W. 988. See also the following discussion of the word in 70 C.J.S. at page 568: "*Permitted.* The word ordinarily implies knowledge and the power to prevent, and, in a general sense, it implies that a person having authority to prevent permitted or consented to the doing of an act."

Although the word "permitted" implies knowledge, we recognize that it does not necessarily imply that defendant had such knowledge for a sufficient period of time to have had a reasonable opportunity to have corrected the slippery condition. However, in this case it could not have been prejudicial to defendant to eliminate the required finding concerning the time element, as the undisputed testimony from witnesses offered by both parties was that there was no way for any oil or grease to get on the platform except from the spilling of diesel fuel in the operation of refueling, and that the last train serviced (1:25 a. m.) should have been refueled and resanded with time remaining for cleaning the platform before the arrival of plaintiff's engine at 4 a. m. For the reasons indicated, we rule, upon the authority of the Howard case, that the failure of the instruction to specifically require a finding as to the elements heretofore discussed did not cause the instruction to be prejudicially erroneous. However, we suggest that it is certainly the better practice, in a case of this nature, for the instruction to specifically require a finding that the defendant had actual or constructive notice of the unsafe condition.

Defendant next contends that the trial court erred in giving Instruction No. 3 because, as stated in its brief, "it is an abstract statement of the law, is not necessary for the determination of any issue in the case, does not give the jury any factual guide for determining any issue in the case, yet it purports to state the entire law with respect to the Federal Employers' Liability Act without stating what care is required of the employer and without specifying the effect of contributory negligence on the part of the employee on the damages recoverable by the employee." The instruction reads as follows: "The jury is instructed that it appears, without dispute, that plaintiff and defendant were engaged in interstate commerce at the time of the accident. Therefore, the rights and duties and liabilities of the parties to this action are not governed, affected or controlled by the laws of the State of Missouri, but the rights, duties and liabilities of the parties are governed and controlled exclusively by the Federal Employers' Liability Act of the United States. The court further instructs the jury that under the provisions of the Federal Employers' Liability Act every common carrier by railroad while engaged in commerce between any of the several states shall be liable in damages to any person suffering injuries while he is employed by such carrier in such commerce resulting, in whole or in part, from the negligence of any of the officers, agents or employees of such carrier."

"While instructions containing mere abstract statements of law should not be given, the giving of such an instruction is not reversible error on appeal, unless it appears from the circumstances of the case that the instruction was confusing, misleading and prejudicial in the particular case." Benham v. McCoy, Mo.Sup., 213 S.W.2d 914, 920. An instruction similar to the one here complained of was held not to be reversible error in the case of Hilton v. Thompson, 360 Mo. 177, 227 S.W.2d 675. We note, however, that the court in that case emphasized the fact that the instruction was followed immediately by plaintiff's main instruction which hypothesized the facts essential to recovery. In the instant case plaintiff's main instruction preceded Instruction No. 3 but we observe that later in the order of instructions there appears an instruction which is substantially a converse of plaintiff's verdict-directing in-

struction. However, since the instructions must be read and considered together, we doubt that the order of giving the instructions would have any effect upon the question before us.

There is no suggestion that the instruction complained of contains any incorrect statement of law. We observe also that it did not direct a verdict. Since the facts essential to a verdict for plaintiff (and the effect of any contributory negligence) were fully detailed in other instructions, we cannot believe that the jury was confused or misled by the instruction under consideration and we accordingly rule that no prejudicial error was committed in giving it. We venture to state, however, that we see no occasion for the giving of an instruction of that kind and suggest that it would be the better practice for trial courts to refuse such instructions in the event they are offered.

■■ During the cross-examination of Mr. Kotzman, a fireman employed by defendant, defendant made the following offer of proof: "Mr. Johnson: We offer to show on cross-examination of this witness that he knows of his own knowledge that he and all of the other employees of the Kansas City Southern, including the plaintiff in this cause, are issued special safety rules and must have them with them at all times, and further that Item No. 2 of the safety rules reads in substance, 'watch for unsafe conditions and correct and report them.'" The court sustained an objection to the offer. Defendant contends that the court erred in excluding the proffered evidence because proof that plaintiff failed to report the hole in the path would have tended to prove contributory negligence. We have concluded that the evidence was properly excluded because contributory negligence in violating the aforementioned rule was not pleaded. Defendant's answer alleged that plaintiff's injuries "were contributed to by his own negligence, in that plaintiff failed to exercise due care for his own safety by failing to observe the conditions of the ground and the con-

ditions of the platform on which plaintiff was walking, even though plaintiff knew of such conditions and even though the conditions then prevailing were apparent to any person in the exercise of ordinary care."

Under the F.E.L.A., contributory negligence is not a complete defense but operates only to diminish damages. "The necessity of pleading contributory negligence as a pro tanto defense to an action brought under the Federal Employers' Liability Act generally depends on the laws of the state in which the action is instituted." 57 C.J.S. Master and Servant § 494(c), p. 40. Missouri appears to have followed the rule that contributory negligence is not available unless pleaded, or unless conclusively shown by plaintiff's own evidence. Sheehan v. Terminal Railroad Ass'n of St. Louis, 344 Mo. 586, 127 S.W.2d 657. However, in any event, since defendant saw fit to allege a specific act of contributory negligence, it is bound by that allegation and a trial court would not commit error in sustaining an objection to evidence offered to prove another act of negligence. Defendant has cited the case of Kansas City Southern R. Co. v. Jones, 241 U.S. 181, 36 S.Ct. 513, 60 L.Ed. 943, wherein the Supreme Court of the United States apparently approved a ruling of the Supreme Court of Louisiana, 137 La. 178, 68 So. 401, to the effect that evidence of contributory negligence, though not pleaded, was admissible in diminution of damages. We think that case is inapplicable here for the reason that it necessarily involved the law of Louisiana, and for the further reason that contributory negligence was not pleaded at all therein, which presents a different problem than that which exists where the contributory negligence is specified in the answer and the defendant attempts to prove other specifications of such negligence.

■ During the closing argument of plaintiff's counsel the following occurred: "Mr. Sweeney: * * * He will be disabled the rest of his life, and his life ex-

pectancy is 17.10 years, and figuring his yearly salary at $6,816.00 makes a total of $116,554. Mr. Johnson: Your Honor, we object to that since there is no evidence he could work the full seventeen years. He was not in good health before August 1956." Defendant here contends that the statement that plaintiff would have earned $116,554 during his life expectancy was not supported by the evidence, and that it was also improper because there was no evidence that plaintiff could reasonably have expected to earn the same amount during his life expectancy as he had earned during the year preceding his injury.

We think the court did not err in overruling the foregoing objection. "Counsel is allowed to state the evidence and all reasonable inferences therefrom most strongly for his client, and an objection cannot be sustained because he is doing so." Goyotte v. St. Louis-San Francisco Ry. Co., Mo.Sup., 37 S.W.2d 552, 556. The sole ground contained in defendant's objection was that there was no evidence that plaintiff could have worked the full seventeen years. The mortality tables in evidence indicated that plaintiff had a life expectancy of 17.10 years. Evidence had been presented in detail as to the state of plaintiff's health before his disability occurred, and the jury could therefore determine whether plaintiff would have been physically able to work throughout the period of his life expectancy. There was no evidence of any mandatory retirement age for engineers employed by defendant. We accordingly rule that the evidence was sufficient to warrant the argument here complained of.

█ In its brief defendant also complains that it was prejudiced by the fact that plaintiff's counsel used a blackboard in demonstrating the foregoing argument to the jury. We note that there is no proof in the transcript that a blackboard was used—no objection based upon that fact was presented to the trial court, and there is no reference to it in the motion for new trial. It is therefore apparent that no question of prejudice resulting from the use of a blackboard is preserved for appellate review.

█ The final contention of defendant is that the verdict of $52,000 is grossly excessive. Before discussing that question we will briefly detail the evidence relating to plaintiff's physical condition, both before and after the amputation of his leg. In 1953 plaintiff lost about six months' work while he was suffering from a heart condition and edema of his legs. He recovered to the extent that he passed the required physical examination and returned to his work and worked steadily until October 1956. He did, however, take digitalis (a powerful heart stimulant) regularly from the time of his 1953 illness until trial time. For several days before being sent to the University of Kansas Medical Center in December 1956, plaintiff had suffered considerable pain in his right leg. Upon examination at that institution his condition was diagnosed as "thrombosis of the right femoral and popliteal arteries with impending gangrene, arteriosclerosis, arteriosclerotic heart disease, and diabetes." As heretofore indicated, an operation was performed at that time and the artery in the thigh was found to be clotted from the groin down to the knee. An unsuccessful effort was made to remove the clot and the leg was then amputated at the mid-thigh level. On December 18, a left lumbar sympathectomy was performed in an effort to increase the blood supply in the left leg. He was dismissed from the Medical Center on December 23, 1956.

Plaintiff testified that on January 26, 1957, he entered a hospital at Pittsburg, Kansas, because of a difficulty with his left leg and remained there until March 31. On May 28, plaintiff went back to the Medical Center and had three heavy sutures removed from the stump of his right leg.

Plaintiff presented the testimony of Dr. W. G. Rheinhart of Pittsburg, Kansas, who stated that he had examined plaintiff in September 1957 and found a moderate de-

gree of diabetes and some hardening of the arteries. In response to a hypothetical question he expressed the opinion that the blood clots which caused the amputation of plaintiff's right leg resulted, at least in part, from the falls plaintiff had suffered in August and October of 1956. He expressed the opinion that relatively slight trauma would result in a blood clot in a person suffering from diabetes and hardening of the arteries. He expressed the further view that plaintiff's normal expectancy, after the loss of his leg, would "be about the same as an average person. He should live, I would say, to something over seventy years at least." When asked concerning plaintiff's disability as a result of the injuries and amputation, he stated, "this man is totally and permanently disabled so far as being a locomotive engineer is concerned."

Plaintiff also called Dr. James W. Graham, a physician and surgeon of Kansas City, who had examined plaintiff about three months before the trial. In answer to a hypothetical question he expressed the opinion that the injury to plaintiff's knee resulting from the falls undoubtedly "caused the blood clot to form and finally resulted in the amputation."

Defendant called as a witness Dr. C. A. Hardin, the surgeon who performed the operation amputating plaintiff's leg, and two surgeons connected with the hospital in Neosho, Missouri, who had made pretrial examinations of plaintiff. Each of these witnesses expressed the opinion that the two falls plaintiff had sustained in no way caused or contributed to cause the blood clot which required the removal of plaintiff's leg.

Plaintiff further testified that he was 56 years old at the time he was injured and that he earned $5,863 in 1954, $7,734 in 1955, and $6,850 during the time he worked in 1956; that his medical expense at the University of Kansas Medical Center was "a little over $1,000"; that he feels pain in the leg that has been removed and that

he had not been able to do any physical work since his leg was amputated.

"There is no precise method for determining the maximum award which the evidence in this case will support. Each case must be considered upon its own peculiar facts. Due regard should be given to the purchasing power of the dollar, to the rule of reasonable uniformity of awards for similar injuries * * *." Burr v. Kansas City Public Service Co., 365 Mo. 115, 276 S.W.2d 120, 127. We recognize that it is most difficult to endeavor to maintain a standard of uniformity of judgments in personal injury cases. In determining the question of excessiveness cases previously decided should be of some assistance, although we recognize that no two cases are exactly alike.

No recent case has been decided by this court which involved injuries similar to those suffered by plaintiff. The last such case was Smiley v. St. Louis-San Francisco Ry. Co., 359 Mo. 474, 222 S.W.2d 481, decided in 1949. In that case a 26-year-old plaintiff earning $2,800 a year lost his left leg six inches below the groin. A judgment of $50,000 was ordered reduced to $27,500. The instant plaintiff was thirty years older but was earning about $7,000 per year. A comparison of the factors involved in the two cases would seem to indicate that, except for the change in economic conditions, the plaintiff herein should not be permitted to recover an amount larger than that approved in Smiley. In that connection, however, we take notice of the fact that there has been a significant decline in the purchasing power of the dollar since 1949 and hence a considerably larger judgment should be approved in the case at bar than was approved in the Smiley case.

We are somewhat impressed by the absence of evidence as to certain facts in the instant case. There was no showing as to the amount of education plaintiff had received; there was no evidence as to the likelihood of plaintiff being able to use an artificial limb; and no evidence on the question of whether plaintiff either could

or could not engage in some vocation or employment other than that of a railroad engineer.

The burden was upon plaintiff to prove the extent of his disability. The only specific evidence on that issue is his testimony that he had not been able to perform any manual labor up to the time of trial, and the opinion of Dr. Rheinhart that plaintiff was permanently disabled "so far as being a locomotive engineer is concerned." The evidence presented will not reasonably warrant an inference that plaintiff is totally and permanently disabled from performing any gainful work or employment. Moreover, while we accept the testimony that plaintiff will live to the end of his life expectancy, the fact that, prior to his injuries, he admittedly was suffering from heart disease, hardening of the arteries, and diabetes, would reasonably warrant an inference that he would not have been physically able to work continuously throughout that period of time.

Plaintiff's medical expense was $1,000, and the loss of wages to trial time totaled approximately $9,500.

Upon a consideration of the facts heretofore stated, in the light of all relevant factors properly to be considered in connection therewith, we have concluded that the verdict herein was excessive and that the maximum amount for which a judgment should be permitted to stand is $40,000. If, within fifteen days from the filing of this opinion, plaintiff will enter here a remittitur of $12,000, the judgment will stand affirmed in the sum of $40,000 as of the date of the original judgment. Otherwise, the judgment will be reversed and cause remanded for a new trial.

COIL and HOUSER, CC., concur.

PER CURIAM.

The foregoing opinion by HOLMAN, C., is adopted as the opinion of the court.

All concur.