**Leeman C. HAHN, Respondent,**

v.

**TERMINAL RAILROAD ASSOCIATION OF ST. LOUIS, a Corporation, Appellant.**

No. 48742.

Supreme Court of Missouri.

Division No. 1.

March 12, 1962.

Rehearing Denied April 9, 1962.

Robert C. Ely, St. Louis, for appellant.

Chopin & Boisaubin, George D. Chopin and Alfred L. Boisaubin, St. Louis, for respondent.

COIL, Commissioner.

Plaintiff claimed $75,000 as damages for personal injuries sustained when he fell from a boxcar as a result of an inefficient hand brake thereon. A jury's verdict for $100,000 was reduced by voluntary remittitur to $75,000 and by compliance with the trial court's conditional order to $65,000. Defendant has appealed.

Plaintiff's action was under Section 11 of the Safety Appliance Act, 45 U.S.C.A. sections 1 to 16, which provides in pertinent part: "It shall be unlawful for any common carrier * * * to haul, or permit to be hauled or used on its line, any car * * * not equipped with * * * efficient hand brakes; * * *."

Defendant contends that plaintiff's verdict-directing instruction was erroneous in that it failed to submit the issue whether the boxcar in question was on defendant's "line" at the time of plaintiff's injury. The railroad's initial position is that there was substantial evidence to support a finding either way on that issue, and that, consequently, the question was one for the jury; its alternative position is that if that question was one of law, the trial court erred in refusing to direct a defendant's verdict. The railroad contends further that the trial court erred in giving instruction 2 and that the judgment is excessive.

Just north of the mill of the Colorado Milling and Elevator Company, d/b/a St. Louis Flour Mills (hereinafter sometimes called the mill) are two of defendant's main line east-west tracks located on its right of way. Between the eastbound main line track and the mill's buildings are three tracks numbered 1, 2, and 3 from north to south and referred to as "industry tracks." All of track 1 is within defendant's right of way and connects with defendant's eastbound main line track at points east and west of the mill. Industry track 2 is located on the mill's property except for a few feet at both its east and west ends where it joins track 1. All of industry track 3 is on the

mill's property. A written agreement in effect between the mill and defendant provided in pertinent parts: that the mill granted to railroad the exclusive right to enter on its land for the purpose of constructing and maintaining and operating over the three industry tracks to be located as heretofore noted; that the mill was to furnish and maintain a satisfactory roadbed and the railroad would construct the industry tracks and "thereafter maintain and repair the same"; that industry would reimburse defendant for the cost of construction (except the cost of plain rails and splices which were to remain the property of the railroad) and for all costs of operation, maintenance, and alteration of tracks 2 and 3; that industry track 1 was to be constructed and maintained by and at the expense of the railroad; that the railroad had a perpetual right to use the industry tracks free of charge (provided it did not unnecessarily interfere with the mill's business) and so long as the defendant offered rates as reasonable as competing lines, the mill would consign and have consigned all its freight over such of defendant's lines as could be used in the shipment of such goods.

Track 1 was 700 feet long. At a place slightly east of midway in its length there was a shaker track or mechanism installed by the mill with the knowledge of defendant and put into operation in August 1957. The shaker track was a separated section of track. A car full of grain would be placed on such section, the car secured by clamps, tilted to the south, and then by a "see-saw" mechanism the section of track was so rocked that within seven to ten minutes all the grain would flow from the car into the mill's storage bins.

The routine followed by the mill and defendant with respect to handling cars of grain was about as follows: The mill's elevator superintendent would direct defendant to deliver from its railroad yard certain boxcars of grain, normally about ten cars at a time. Defendant's train crew would place the ten boxcars coupled to-

gether at the west end of track 1 with their air brakes set. Mill employees would then set the hand brakes on the two westernmost cars so that if the air leaked from the air brakes, the hand brakes so set would tend to hold the string of coupled cars. The mill owned and operated a trackmobile which ran both on tracks and, by lowering rubber tires, on roads or on the ground. The trackmobile operator would uncouple the easternmost car from the others and pull it eastwardly onto the shaker track. The trackmobile would then uncouple and go from the east to the west end of the car. After the car had been emptied the trackmobile would push it eastwardly to give it a start, then disengage itself and permit the boxcar to travel on eastwardly downgrade. Stationed on a platform at the brake end of each of such emptied boxcars would be the elevator dumper operator's helper, who would control the speed of the car by operating the hand brake and thus cause the car to couple properly with any car which was standing on the east portion of track 1.

Plaintiff was the helper at the time in question and about 5:50 p. m. took his place on the platform provided below the brake on the end of a boxcar which had just been emptied at the shaker track. The car was shoved eastwardly by the trackmobile. Plaintiff immediately, as was routine, turned the hand-brake wheel five or six turns to remove the slack. When the car had traveled some distance and had reached its usual speed of four to six miles per hour, plaintiff began to turn the wheel to tighten the brake so that a proper coupling could be made with a car standing near the east end of track 1. He wound the brake 18 to 25 times but it had no effect. The boxcar did not slow but increased in speed and as a result of the force of its collision with the standing boxcar plaintiff was thrown to the ground and received injuries which will be hereinafter described.

The mill maintained no track crew. When it wished track repairs made, it hired an independent company. The mill's employees were not qualified to inspect railroad equipment brakes. The moving of railroad cars within the mill area was done by a mill company employee and its employees operated the trackmobile and the shaker.

There was testimony that it was possible, though not probable, that if a boxcar's hand brake was on at the time the "see-saw" action was applied to empty a car, brake parts could fail as a result of that action; that if the hand brake were off, such action would not create any stress on the brake and would not cause any part of the mechanism to fail.

■ By reason of the provisions of the Safety Appliance Act, the railroad was liable if the hand brake failed to operate efficiently while the boxcar was being hauled or used on its line, irrespective of fault. Myers v. Reading Co., 331 U.S. 477, 67 S.Ct. 1334, 91 L.Ed. 1615. Defendant concedes that there was substantial evidence that the brake in question did not operate efficiently and that the inefficient brake was a proximate cause of plaintiff's injuries. The question is whether the boxcar was on defendant's line and, if there was evidence to so show, whether the jury should have been required to so find.

■ It is our view, for the reasons which will appear, that, as a matter of law, the boxcar from which plaintiff fell was being used on defendant's line at the time of plaintiff's injury.

Defendant's position is that when fact situations are presented in which an industry is being served by a single railroad, the test which determines whether the track in question is part of the railroad's line is the extent of "the control by the industry"; and that determinative matters include whether the industry maintains its own crew for inspection and repair of cars and its own motive power for moving cars on industry tracks. Defendant argues that these five things are supported by the

evidence and present a disputed fact question whether track 1 was the railroad's "line": (1) The shaker track, part of track 1, was installed and maintained by the mill, and corollary, possibly the shaking operation caused damage to the brake in question. (2) After the boxcars are placed on the west end of track 1 by defendant, they are thereafter moved by mill employees until they reach a stationary place at the east end of track 1. (3) Boxcars are delivered by defendant to the west end and removed from the east end of track 1 only upon order of the mill's elevator supervisor. (4) The mill, in practice, hires an independent company to repair the three industry tracks even though track 1 is wholly within the railroad's right of way and even though, as defendant says, it is obligated by the contract to maintain track 1. That is true by a specific provision of the contract, and it is also true that another paragraph of the contract obligates defendant to maintain all three tracks. (5) Track 1, as well as are tracks 2 and 3, is designated an industry track by the contract and all three serve the mill.

While some of the foregoing facts might, in connection with other factual circumstances, tend to indicate a degree of control by industry which, together with other facts, could be decisive of whether a certain railroad car was or was not being used on a certain railroad's "line," it seems to us that none of the suggested facts change the conclusion which is compelled under the undisputed facts in this case that the boxcar from which plaintiff fell was being used on defendant's "line" at the time.

Track 1 was on defendant's right of way, defendant owned the ties and the rails, had the duty to maintain that track, and the exclusive right to use it (when not unnecessarily interfering with the mill's operation). That track did not cease to be an integral part of defendant's "line" simply because mill employees moved boxcars of grain from the west end of track 1 to the shaker and thence to the east end

of track 1. Under the facts of this case the act of the mill, through its employees, in moving the boxcars to and from the unloading point (all on defendant's track) only assisted the defendant in the operation of cars on its line. It would have been no different, so far as concerns the present question, had the railroad crew delivered each car to the shaker track, waited while the mill employees unloaded each car, and then returned each car to the railroad yard. The fact that the railroad and the mill followed an obviously mutually agreeable unloading routine on defendant's track whereby mill employees assisted defendant in the operation of cars in interstate commerce by notifying the railroad to deliver cars of grain for unloading, by moving those boxcars, and by operating the hand brakes thereon, would not cause defendant's track to cease to be a part of defendant's "line." Nor is the fact that the mill installed and maintained the shaker mechanism with the full knowledge and acquiescence of defendant of any significance on the question here. The shaker mechanism and the trackmobile used in placing the cars for unloading were simply parts of the agreed-upon unloading process and method conducted on defendant's "line." And the fact that the mill owned and used a trackmobile in that unloading process did not constitute the mill the operator of "a railroad system" or cause defendant's track 1 to become a part of the mill's "railroad line" during the time the mill employees moved the cars from the west end of track 1 to the shaker and thence to the east end of defendant's track 1. The mill maintained no railroad crews and no brake inspectors. The fact that the three tracks were denominated "industry tracks" in the contract is not significant on the question here in view of the specific contract provisions heretofore noted. While the contract made track 1 usable by the mill for unloading cars of grain, its provisions as a whole were consistent only with the conclusion that track 1 remained an integral part and portion of defendant's line.

Defendant relies on Patton v. Baltimore & O. R. Co., 3 Cir., 197 F.2d 732, and Risberg v. Duluth, M. & I. R. Ry. Co., 233 Minn. 396, 47 N.W.2d 113. In each of those cases an employee of a quarrying company was injured while railroad cars were being loaded or moved by quarry employees on tracks owned by the quarry company. In each case the court held that the Safety Appliance Act was not applicable because the cars were not being used on the respective railroad's line. In each case the court treated the system of tracks on the industry's property as though it constituted a private railroad system and decided each case as though the facts were that a common carrier had delivered cars to another private railroad system and thereafter, until returned, the cars were operated upon the "lines" of the private system. The Patton and Risberg cases are clearly distinguishable, and that fact is sufficient for present purposes, making it unnecessary to approve or disapprove the results in or the rationale of those cases. It is apparent in the present case that the mill company was not operating a private railroad system; and, furthermore, the facts in this case are that the injury occurred on defendant's track on defendant's right of way, and not on a track owned by an industry and part of a railroad system located on industry's property.

In Rush v. Thompson, 356 Mo. 568, 202 S.W.2d 800, a railroad contracted with the government to operate trains over the government's tracks from Bundy, Missouri, to Ft. Leonard Wood and return, to furnish freight and passenger service, and to perform maintenance on the government's railroad facilities. Pursuant thereto, railroad employees spotted certain cars of coal on a spur track within the fort. Thereafter, the railroad employees had nothing further to do with those cars until they had been unloaded by government employees, when the empty cars were picked up and returned to Bundy by railroad crews. The unloading routine was this: The cars of coal left on the spur track by the railroad would be unloaded by placing them, one at a time, over a conveyor. When one car was almost empty, another full one would be brought within six or twelve feet of the end of the one being unloaded. When unloaded, the empty car would be rolled on down a grade and the loaded car moved over the conveyor. Sometimes the loaded car would be permitted to bump the empty to give it the start needed to roll it downhill, and sometimes a diesel engine was used to move the empty car. On the occasion in question plaintiff, a government employee, was engaged in unloading an almost empty car of coal. The next car to be unloaded (which had been delivered by the railroad three days before) was uncoupled from other standing cars of coal and given a start so it would roll north toward the conveyor. A government employee was on the loaded car to operate the hand brake. He intended to stop the loaded car before it reached the empty (in which plaintiff was working), but when he applied the brake it had no effect and the loaded car bumped the empty and injured plaintiff. The court held that at the time of plaintiff's injury, the coal car was being used on defendant's line within the meaning of the Safety Appliance Act. It is true, as pointed out by the Minnesota court in the Risberg case, supra, in attempting to distinguish the Rush case, that the railroad's contract with the government made the government's tracks a part of defendant's "line" of railroad; but it is also true, and more relevant, that in so far as control is concerned, the government had far more control of the coal cars in the Rush case than the mill had of the grain cars in the present case.

In Monongahela Railway Co. v. Black, 4 Cir., 235 F.2d 406, four side tracks (which were downgrade from north to south) served a coal mine and passed under the mine's loading tipple. After empty cars were placed on the north end of a sidetrack by the railroad, mine employees released the brakes and the cars

rolled south to the tipple where they were stopped, loaded, and the brakes again released so that the cars coasted downhill to the south end of the sidetrack where the brakes were applied and the cars left standing until the railroad picked them up and carried them to their destinations. One of the coal company's employees was riding a loaded car south from the tipple in order to apply the brake and stop the car before it collided with other loaded cars which were standing at the south end of the track. The brake was ineffective and the ensuing collision injured plaintiff who was a railroad conductor standing on the track checking numbers on the loaded cars preparatory to returning them to the main line. The court said at 235 F.2d 407: "Even in the broadest sense, it cannot be said in this case that the Coal Company operated an independent railway system. The Coal Company owned no engines or other rolling stock and it operated none. It did not and was not equipped to inspect and repair freight cars; nor did appellant expect it to do so. The Coal Company was a customer of appellant whose sole contention with the cars was the loading of them. The placing of the cars for loading and the loading of them were all a part of the interstate movement of coal over appellant's railway system. At some inconvenience, the cars might have been loaded on appellant's main line, in which case there could be no doubt as to the application of the Act. We are not prepared to hold that a railroad is relieved of its responsibility to provide safe appliances when it places one of its cars on a side track for the sole purpose of having it loaded with freight to be hauled by it. In this case, the side tracks would have been utterly valueless without the railroad. As used, they operated to promote commerce over appellant's line of railroad." See also Callahan v. New York Cent. R. Co., Ohio Com.Pl.Court, Hamilton County, 8 Ohio Supp. 45.

We have said that the "undisputed" facts compelled the conclusion as a matter of law that the car was being hauled and used on defendant's line at the time of plaintiff's injury. Now, of course, simply because facts are undisputed does not eliminate the requirement in most instances that a jury must find those "undisputed" facts before the one having the burden of proof may recover. As we understand, defendant in this case does not on this appeal object to plaintiff's verdict-directing instruction because it failed to hypothesize the facts which, if found, would (as we have held) compel the conclusion, as a matter of law, that the boxcar was on defendant's line; defendant's objection to the instruction is that it did not permit the jury to determine the ultimate question, viz., whether the car was being used on defendant's line. We hold, therefore, that instruction 1 was not erroneous for its failure to hypothesize that "the railroad car was being operated on defendant's line," for the reasons heretofore stated. What we have said with respect to defendant's contention as to instruction 1 necessarily answers defendant's (seemingly inconsistent) alternative contention that it was entitled to a directed verdict on the ground that, as a matter of law, the boxcar was not being used on defendant's line.

Defendant contends that instruction 1 conflicts with instruction 2 in this: that the effect of instruction 1 was to authorize the jury to find for plaintiff if it found that plaintiff was injured as a proximate result of the failure of the hand brake to operate properly, i. e., the recovery was based on a violation of an absolute duty irrespective of fault; while instruction 2, a nonverdict-directing instruction, apparently intended to make it clear to the jury that it could find for plaintiff even though it found that "some portion or portions" of track 1 (shaker track?) belonged to the mill, provided however, said the instruction, that the jury found: that track 1 was on defendant's right of way; that it was defendant's duty to have constructed and to maintain track 1; and that defend-

ant had the right to use track 1 free of charge. We agree with defendant that any facts which the jury must have found prerequisite to a verdict for plaintiff should have been hypothesized in plaintiff's verdict-directing instruction, and we agree also that the instructions are in conflict in that instruction 1 authorizes a verdict without reference to whether the mill owned part of track 1 while instruction 2 told the jury that mill ownership of a part of track 1 was of no consequence only if it found certain hypothesized facts. We do not agree, however, that whatever conflict thereby existed was prejudicial to defendant; nor do we agree with defendant's further contention that instruction 2 was confusing and misleading because of the proviso noted. Our conclusions in those respects are because: (1) Under our holding heretofore it was not essential to plaintiff's recovery that the jury find the hypotheses in the proviso of instruction 2 and, consequently, their omission from instruction 1 was harmless and any conflict arising by reason of the unnecessary burden plaintiff assumed by the proviso of instruction 2 could not have prejudiced anyone other than plaintiff; and (2) inasmuch as instruction 1 contained hypotheses of the essential facts (as against the contentions on this appeal) entitling plaintiff to recover, it was immaterial whether the jury did or did not also find the facts hypothesized in the proviso of instruction 2, and thus, the confusion, if any, as to whether the jury needed to and did find only the facts hypothesized in instruction 1 or needed to and did find also the facts hypothesized in the proviso of instruction 2, could not have prejudiced defendant.

■ Defendant contends that plaintiff's $65,000 judgment is excessive. Plaintiff was 47 at trial time in December 1960 and 45 when injured on November 20, 1958, when, as noted, he fell to the ground from a brake platform near the top of a boxcar. He sustained a severe injury to his right lower leg. He suffered intense pain at the time of his fall and his right foot and ankle were bleeding. He was taken to a hospital where he was given medicine to relieve his pain, was treated for shock and his leg immobilized. The following morning he was examined by an orthopedic surgeon who found that plaintiff's right leg was badly lacerated, the tissues thereof were badly mangled, and that plaintiff had suffered a comminuted compound fracture of both the tibia and the fibula of the right leg with the bone protruding from the wound and involving many bone fragments. The fracture of the tibia extended into the ankle joint; the fibula was fractured at the junction of its middle and lower third. Plaintiff was in surgery for five hours under a general anesthetic, during which he received blood transfusions. Two incisions, one on each side, were made, extending the full length of the leg. The leg was cleansed and six pins, each five thirty-seconds of an inch in diameter, were placed through the tibia so that the ends of the pins extended for two or three inches beyond the bone on each side. The pins began at a point above the fracture site and were placed at intervals down to the heel bone. The fracture was reduced, the torn ligaments sutured and placed in position, and a bar was clamped to the ends of the pins on each side to hold the fracture securely. Plaintiff had lost skin as a result of the accident on the inner side and front part of his leg and developed a skin thrombosis which caused drainage and required four or five skin grafts at different times. The first skin graft was performed March 24 and the second on April 9, 1959. The grafts were surgical operations and were performed under anesthetics. While in the hospital, plaintiff developed a localized osteomyelitis, an infection of the bone, including the presence of some dead fragments of bone. The dead fragments were removed and the bone was scraped. The pins were removed from the leg on April 9, 1959, and a plaster-of-Paris cast applied. During the period of his hospitalization plaintiff's right leg continued to hurt and he was

given medicine for pain and sedatives for rest.

When plaintiff was discharged from the hospital at the end of six months he was directed to and did return for checkups every five to seven days. During those visits three new casts were applied. He re-entered the hospital on November 24, 1959, because of an inadequate bone union. A bone graft was performed which involved reopening the leg, removing some infected bone, positioning the bone, removing a piece of bone (4½–5 inches long and ½ inch in diameter) from the ilium and attaching it to the upper portion of the tibia by a pin and wedging it in a slot which had been made in the lower portion of the tibia. Fragments taken from the pelvic bone were ground into bone meal which was molded around the graft area to stimulate bone healing. Two more skin grafts were performed, one on January 14 and the other on March 11, 1960. One of them involved taking twenty-two pieces of skin from plaintiff's left side and placing them on his leg. He was discharged from the hospital the second time on May 5, 1960, after having been hospitalized for more than five months. A new cast was applied at the time of discharge and plaintiff was using crutches. Since then the doctor had seen plaintiff once a week at the hospital. The cast was removed two months before trial. Less than a month prior to trial plaintiff began using a cane. Osteomyelitis again developed after plaintiff left the hospital the second time and it was certain at trial time that he would need to return to the hospital and undergo another operation to remove the dead fragments of bone and have the infected bone scraped. This would require future hospitalization of from two to six weeks.

Plaintiff was suffering pain in his right foot at trial time and noticed the pain particularly when he was on his feet for any length of time. At trial time he did not have the same use of his right foot as of his left; the right ankle joint and the area above it were stiff. Plaintiff had

been unable to do any work since the accident.

Plaintiff will have future disability including considerable loss of motion of and stiffness in his right ankle. The doctor was of the opinion that it was problematical as to when plaintiff could return to any kind of work; the date depended upon how he recovered from the additional surgery, but it was certain that plaintiff could not return to work for at least six months following the trial. It was the doctor's further opinion that if and when plaintiff returned, he should begin with light work until such time as his leg could tolerate a certain amount of abuse; but that whether plaintiff could ever return to even light work depended upon whether the bone infection could be stopped. The doctor was unable to state with certainty whether the bone infection could be arrested but he had "a reasonable idea" that it could be stopped based on the progress plaintiff had made because of the last bone graft. The doctor also said that when a man, 47 years of age, has had osteomyelitis for two years, he may have numerous attacks when the skin will break open and form a blister resulting in drainage; if such happens to plaintiff he will be prevented from working, depending on the amount of drainage. The enlargement of the ankle and loss of motion therein are permanent conditions. The smaller bone, the fibula, is still out of position but such has no effect on the use of the leg. It was the doctor's prognosis that ultimately plaintiff's leg will be usable provided the bone infection is stopped. The tibia is in good alignment and there is bone union which has been showing continued improvement, but the doctor made it clear that the residual osteomyelitis would have to be corrected if plaintiff was to have a usable leg.

Reasonable charges for medical service for which plaintiff was liable at trial time amounted to $4,000 and the doctor's estimate of his charges for future surgery was $500 to $750. The total hospital bill to the

time of trial, including outpatient charges, was $6,552.75. Plaintiff's take-home pay at the time of his injury was $96 or $97 per week. Thus a jury reasonably could have found that plaintiff's special damages, including estimated future medical and hospital expenses which it was reasonably certain plaintiff would incur and including loss of wages to trial time and for the minimum 6-months' period thereafter, exceeded $25,000.

The foregoing résumé demonstrates that plaintiff suffered severe and painful injuries requiring a long course of extensive and painful surgery and care; that he has been hospitalized for eleven months and will be hospitalized in the future; that he has sustained special damages in the large amount of $25,000; that he has certainly sustained as permanent injuries the enlargement of and considerable loss of motion of his right ankle; that the jury reasonably could have believed that plaintiff will suffer not only future pain and disability but that future use of his leg sufficient to enable him to work and earn is extremely problematical, even though it was the doctor's qualified opinion that eventually the bone infection would be eradicated; that, consequently, the amount of his future loss of earnings is somewhat speculative because it depends, of course, upon whether he can and, if so, when he can return to work. The jury was entitled to reason from the evidence that the period during which he would lose earnings would extend well beyond the suggested minimum period of six months following the trial.

Defendant cites these three cases to demonstrate the excessiveness of the judgment: Moss v. Mindlin's, Inc., Mo., 301 S.W.2d 761, 773–775; Carnes v. Kansas City Southern Ry. Co., Mo., 328 S.W.2d 615, 622–624; and Bowyer v. Te-Co., Inc., Mo., 310 S.W.2d 892, 897–901. Plaintiff counters with these two cases and relies on the Moss case cited by defendant to demonstrate that the judgment is not excessive: Tatum v. Gulf, M. & O. R. Co., 359 Mo. 709, 223 S.W.2d 418; Sanders v. Illinois Cent. R. Co., 364 Mo. 1010, 270 S.W.2d 731. We have examined and have considered those cases and others, including our recent case of Erbes v. Union Electric Co., Mo., 353 S.W.2d 659. Some of them, particularly the Moss, Carnes, and Erbes cases, have been helpful in our effort to arrive at a conclusion in this case.

Giving effect to the dates of and the holdings in those cases, having regard for the rule of reasonable uniformity, and taking into account the purchasing power of the dollar; duly considering plaintiff's age, the nature and extent of his injuries, his extensive hospitalization, surgery, and the course of his treatment; giving attention to the fact that he sustained a monetary loss of $25,000; giving recognition to the fact that the jury and the trial judge reasonably could have believed that the prognosis as to plaintiff's leg due to the recurrence of osteomyelitis was unfavorable and made the extent of the leg's future use and the extent of plaintiff's future earning capacity problematical, but justifying the conclusion that it was probable that plaintiff would have a substantial impairment of his future earning capacity; we are of the opinion that we would not be justified in holding that the trial court abused its discretion in limiting the amount of the remittitur to $10,000.

The judgment is affirmed.

HOLMAN and HOUSER, CC., concur.

PER CURIAM.

The foregoing opinion by COIL, C., is adopted as the opinion of the court.

All concur.